UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

------------------------------------------------------------

| | |
|---|---|
| Robert Steinbuch | :Index No.: 4-08-cv-000456 JLH |
| **Plaintiff,** | : (Chief Judge Leon Holmes) |
| | : |
| -v- | : |
| | : |
| | : |
| **Hachette Book Group, AKA Hatchette Book** | : |
| **Group** | : |
| **Defendant.** | : |

------------------------------------------------------------

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
DEC 15 2008
JAMES W. McCORMACK CLERK
By: _____ DEP CLERK

## RESPONSE TO DEFENDANT'S MOTION TO DISMISS

### Backgound

    Plaintiff, a law professor, appears pro se in this action. Plaintiff filed an action in federal court in Washington D.C. (the "D.C. Action"), pursuant to his Constitutional rights under the First and Fourteenth Amendments, because Jessica Cutler committed several torts against Plaintiff, including violating his right to privacy, by writing an internet website ("weblog" or "blog") exposing Plaintiff's private and personal facts and telling falsehoods about him. The blog was uniquely entitled—the *Washingtonienne*. Defendant Cutler filed several motions to dismiss in the D.C. Action, and the D.C. District Court denied each and every one of those motions to dismiss.

    Plaintiff, thereafter, filed an action in this Court for the torts occasioned by the continued exploitation of, and injury to, Plaintiff through the publication of the privacy-invading book (the "Arkansas Book Action"). The book is identically entitled to the blog— both called the *Washingtonienne*. Cutler's contract with the the Disney publishing company Hyperion *required* the book to be based on and an expansion of her real-life blog.[1] Exhibit 1

---

[1] Cutler commented in the press that she feels sorry for those people that write blogs for years and never obtain a book deal.

Dockets.Justia.com

(The Contract for the book—on the very first page—explicitly states "The *Washingtonienne* is a roman a clef . . . based on the author's real life social and sexual escapades as recorded in her scandal inducing blog, *Washingtonienne*.").

According to the advertisement of Hyperion/Disney, the book is an "utterly unrepentant roman a clef exposing the scandalous truth. . . . [Cutler] uses her 'real life experience. . . for a sexy, semi-autographical novel that is sure to initiate a . . . game of Who's Who.'"[2] Hyperion/Disney specifically advertised the book as being in "a witty, unapologetic voice, the novel's narrator . . . tells the story of . . . the staff counsel [i.e., Plaintiff] whose taste[s] . . . she 'accidentally' leaks to the office."[3]

Cutler's ill-gotten booty from her six-figure book deal, as well as her other exploits—such having recently been linked to the prostitution ring that serviced the then-Governor of New York[4]—apparently did not sustain the lifestyle that she desired.[5]  So Cutler filed for bankruptcy.  Pursuant to the bankruptcy process, Plaintiff filed papers with the Bankruptcy Court (the "Bankruptcy Action") indicating that Cutler's debts resulting from her repeated exploitation of Plaintiff were not dischargeable in bankruptcy because Cutler's actions were "willful and malicious."  11 U.S.C. §523(a)(6).

---

[2] Exhibit 2.

[3] *Id.*

[4] *See* Eane MacIntosh and Chuck Bennett, "MADAM" LINK TO DC VIXEN: PROBERS SEEK SENATE SCANDAL GAL, New York Post (March 28, 2008), available at:
http://www.nypost.com/seven/03282008/news/regionalnews/madam_link_to_dc_vixen_103854.htm. (Exhibit 6); *see* Exhibit 3 (Cutler's "hometown paper").

[5] In responding to what she has done with her new found wealth resulting from her lucrative book deal, Cutler said "I guess you can buy more drugs."

Finally, in the aforementioned Arkansas Book Case, Plaintiff asserted causes of action against the distributor of the book—the *Washingtonienne*. As it turned out, that distributor had sold those rights to Hachette. So Plaintiff filed the instant action to again assert his rights against the distributor of the tortious book—the *Washingtonienne*.

## Defendant's New-found Claim that the *Washingtonienne* is Fiction is Belied by Its Own Statements

A.     Hachette Admits That the Book is Not Fiction

Hachette argues (somewhat schizophrenically) that the book subject to this suit is fiction. The difficulty is that Hachette has been caught in a conundrum, as everyone involved in publishing the book has previously stated that the book is **not** fiction. Hachette cannot now argue the contrary for the purposes of its motion to dismiss. Indeed, Hachette in other parts of its own brief, argues that the book is not fiction.

Cutler's contract with the Hyperion/Disney *required* the book to be based on her real-life blog.[6] Exhibit 1 (The Contract for the book—on the very first page—explicitly states "The *Washingtonienne* is a roman a clef . . . based on the author's real life social and sexual escapades as recorded in her scandal inducing blog, *Washingtonienne*.").

Additionally, Hyperion/Disney advertised the book as:

> [a] *sharp*, steamy, utterly unrepentant roman à clef exposing the scandalous truth of what goes on in the corridors of power on Capitol Hill, *based on the author's actual weblog of the same name*. Washington, D.C., staffer Jessica Cutler created a sensation last year when, in an on-line weblog meant just for friends, she began chronicling her late-night affairs with Washington power brokers. But word about her dishy and humorous account of her relationships with six different men on Capitol Hill inevitably spread around town and became such a hot topic that it got her fired from her entry-level job in the office of Senator Mike DeWine (an Ohio Republican). Now, in *The Washingtonienne*, *Cutler's real-life*

---

[6] Cutler commented in the press that she feels sorry for those people that write blogs for years and never obtain a book deal.

*experiences* in the capital become fodder for a sexy, *semi-autobiographical* novel that *is sure to initiate a new Washington parlor game of Who's Who.*

...to the staff counsel [i.e., Plaintiff], whose taste for spanking she "accidentally" leaks . . . [the] loosely fictionalized exploits serve up large portions of D.C. dish.[7]

As can be seen, not only was the book advertised as true, the advertisement itself invited readers to determine exactly who is depicted in the book and specifically identified Plaintiff.

Moreover, both the advertisement for the book and Cutler's contract describe the book as a "roman a clef," which is defined as "[n]ovel that has the extraliterary interest of portraying identifiable people more or less **thinly disguised** as fictional characters."[8] Indeed, Wikipedia itself describes as a notable example of a "roman a clef" as *The Washingtonienne* (2005) based on the author Jessica Cutler's sexual affairs as a congressional intern with various men in Washington, D.C."[9] In fact, the book took great pains to identify Plaintiff. While Defendant asserts that the book changed the name of Plaintiff, Defendant conveniently failed to disclose that the book simply replaced Plaintiff's name with that of his deceased father.

*After* Plaintiff filed suit in the D.C. Action, the advertisement was re-worded—specifically removing all previous references explicitly based on Plaintiff and Hyperion's previous explicit representations that the book is **not** fictional. Hyperion's actions were done with such haste to cover its tracks that the ensuing first paragraph is unintelligible: "The

---

[7] Exhibit 2 (emphasis added).

[8] http://encyclopedia2.thefreedictionary.com/roman+%C3%A0+clef (emphasis added).

[9] http://en.wikipedia.org/wiki/Roman_%C3%A0_clef.

blog that scandalized Washington, D.C., is *not* a sharp steamy, utterly unrepentant novel set against the backdrop of the nations' capital . . . [sic]."[10] Such actions demonstrate clear consciousness of guilt.

Indeed, the Washington Post—in an article published *before* Hachette distributed the Book—reported:

> "Novel" is in quotation marks for the obvious reason: Apparently just about the only fictitious things in "The *Washingtonienne*" are the names. Everything else appears to be a literal account of Cutler's adventures, from her college years at Syracuse to her brief fling on the New York nightclub scene to her arrival in Washington, where she finagled a job on the Hill, merrily hopped from bed to bed and got what passes for a comeuppance in this city, where the only crime is getting caught and the rewards for hanky-panky are lavish: notoriety, airtime and a fat book contract.[11]

Hachette was on notice by the advertisements and press reports for the book—prior to its distribution—that the book was not fiction. Hachette clearly knew that the book was not fiction.

But even if Hachette wants to claim that the work is fiction, notwithstanding the above, Plaintiff's claims would still readily survive.

As one court stated, "the use of pseudonyms would not have gotten Lemann and Knopf [the author and publisher of a book] off the legal hook. [Because t]he details of the [plaintiffs'] lives recounted in the book would identify them unmistakably to anyone who has known the [plaintiffs] well for a long time (members of their families, for example), or who

---

[10] Exhibit 4 (emphasis added).

[11] http://www.washingtonpost.com/wp-dyn/content/article/2005/05/23/AR2005052301809.html. Attached as Exhibit 5.

knew them before they got married; *and no more is required* for liability either in *defamation law* or in *privacy law*."[12]

Another court, in *Batra v. Wolf*, ruled:[13]

> This is a motion to dismiss a libel-in-fiction claim arising out of an episode of the television series Law & Order . . . . Famously evoking the phrase "ripped from the headlines," the show features stories and characters based upon current events. . . . Batra argues that because of the uniqueness of his name, ethnicity, and appearance, any person who knew him, or had heard of him, would identify him with [the "fictional" character] Patel. Moreover, because of the widespread media coverage of the Garson/Siminovsky scandal, with which the accusations against him [Batra] were inextricably intertwined, it would be reasonable for a viewer to associate Batra with [the "fictional" character] Patel. This Court agrees. . . . Defendants argue that no reasonable viewer could believe that [the TV show] stated actual facts about Batra. They deny that [the TV show] depicts actual events with respect to the Garson/Siminovsky scandal. Even if it did, the [the "fictional" character] Patel character refers to [another real person, *i.e.*,] Siminovsky. This Court disagrees. In the context in which [the TV show] was presented, extensive media coverage linking Batra to the Garson/Siminovsky scandal, there is a reasonable likelihood that the ordinary viewer, unacquainted with Batra personally, could understand [the "fictional" character] Patel's corruption to be the truth about Batra. While the accusations against Batra were for graft rather than for bribery, it cannot be said that this distinction is sufficiently "far-fetched" that [the "fictional" character] Patel's corruption could never be understood as describing actual facts.[14]

Indeed, the parallels here are telling. Here the book the *Washingtonienne* was advertised as true, where the TV show *Law & Order* was advertised as tied to the truth. Here, as in *Batra*, Plaintiff was identifiable based upon his unique characteristics—actually emphasized in the advertisement for the book the *Washingtonienne*. Moreover, *Batra* emphasizes that media attention on the plaintiff that tied him to the ensuing, allegedly fictional account (TV show) *strengthens* plaintiff's claim for libel-in-fiction. So, Hachette's

---

[12] *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1233 (7th Cir. Ill. 1993) (emphasis added).

[13] N.Y. Sup. Ct., No. 116059/04, 36 Med.L.Rptr. 1592 (3/18/08) (emphasis added), Exhibit 6.

[14] *Id.*

emphasis of the media coverage of Plaintiff's litigation only serves to *bolster* the validity of the claims against Hachette, as more people are likely to equate Plaintiff with the discussion of him in the book the *Washingtonienne*.

B.      Hachette Admits Knowing of the Tortious Nature of the Blog

Hachette then desperately transforms its argument to claim that even though the book is tortious, Hachette isn't responsible because it is protected by the "wire-service defense." Hachette, however, faces numerous insurmountable hurdles in its desperate, post-hoc attempt to avoid its legal obligations.

The "wire-service defense" states:

> If you republish a news item from a "reputable news service," you may be covered by a privilege called the "wire service defense." This defense to a defamation claim is distinct from the immunity provisions in the section 230 of the Communications Decency Act (commonly referred to as CDA 230 immunity), which [only covers Internet publication,] may also cover if you republish content from a third-party. . . . [I]t is not clear how wide a net is cast by the term "reputable news agency." Traditional wire services such as the Associated Press and United Press International would likely be covered, but courts have not yet looked at the wire-service defense in light of RSS feeds and similar distribution tools. . . . [Moreover,] not all states recognize the wire service defense.[15]

First, Hachette has not distributed anything from a "reputable news service." Quite the contrary, Hachette distributed a book by a now-admitted prostitute and drug user that Hachette *concedes* it knew (prior to its distribution of the book) was already subject to suit for her tortious behavior toward Plaintiff.

And while Hachette has cited absolutely *no* Arkansas law whatsoever demonstrating that Arkansas has even adopted this defense, Hachette concedes that even if applicable, this

---

[15] http://www.citmedialaw.org/legal-guide/wire-service-defense.

defense still imposes liability if, as Hachette acknowledges, Hachette *"knew or had reason to know* of the existence of [tortious, including] libelous matter in the Publication."[16]

Well, as discussed, Hachette *was* on notice *and* had actual knowledge of the tortious nature of the book. The D.C. Action, which Hachette *admits*[17] preceded its distribution of the book, *explicitly* put Hachette on notice of the tortious nature of the book, and, as such, Hachette *"knew or had reason to know* of the existence of [tortious, including] libelous matter in the Publication."[18] Hachette specifically so stated in its own brief: "plaintiff filed his D.C. lawsuit as a matter of public record on May 16, 2005, before the date of the alleged conduct [of the book's distribution by Hachette] giving rise to plaintiff's [current] claims [in the instant case], which, according to the complaint was 'Beginning on or about June 1, 2005'"[19] And, "in his D.C. lawsuit, the plaintiff . . . [described] Jessica Cutler's Internet weblog [entitled the *Washingtonienne*] that he alleged invaded his privacy and caused him emotional distress."[20] Thus, by Hachette's own admission, two weeks *prior* to Hachette's distribution of the book, Hachette *knew* that Plaintiff had alleged that the blog that was the basis for the book invaded Plaintiff's privacy and otherwise violated his rights. Accordingly, even under Hachette's formulation of the law, Hachette has *admitted* that it was liable. Hachette cannot escape liability on a motion to dismiss given these undisputed facts.

---

[16] Hachette's Brief in Support of this Motion to Dismiss at 4 (emphasis added).

[17] *See* Hachette's instant motion at ¶¶ 16, 21 (D.C. case filed 5/16/2005 and Hachette's distribution of the book began two weeks later on 6/1/2005).

[18] Hachette's Brief in Support of this Motion to Dismiss at 4 (emphasis added).

[19] Hachette's Br. at 8.

[20] Hachette's Br. at 7.

Further, Hachette wholly fails to even disclose to this Court, no less address, the line of cases such as *Triangle Publications, Inc. v. Chumley*,[21] which demonstrate that Hachette is subject only to a negligence standard, and, as such, is clearly liable. Indeed, *Triangle* has remarkable parallels to the instant action. In *Triangle*, plaintiff brought a defamation case against a newspaper that *distributed* an advertisement in the newspaper.[22] The newspaper *did not create* in any way the advertisement.[23] The advertisement was created by the advertiser—a local television channel advertising for a new TV show—not the newspaper distributing the material.[24] The advertisement depicted the plaintiff's picture under a *different* name, and suggested that she was pregnant.[25] The court held that the newspaper could be held liable for not properly screening the advertisements that it distributed but did not create.[26] Specifically, the court held "appellants argue that they were entitled to rely on an advertisement prepared and submitted by WXIA-TV, a duly licensed television station, and are not responsible for any factual errors or defamatory matter contained therein. We disagree."[27] Additionally, the court specifically held that the use of a different name for plaintiff in the advertisement did not insulate in any way the newspaper from liability for

---

[21] 253 Ga. 179, 317 S.E.2d 534 (1984); *see also Pettengill v. Booth Newspapers, Inc.*, 88 Mich.App. 587, 278 N.W.2d 682 (1979).

[22] *Id.*

[23] *Id.*

[24] *Id.* at 180.

[25] *Id.*

[26] *Id.* at 182.

[27] *Id.* at 183 (emphasis added).

distributing the tortious advertisement created by a third party.[28] The court held that the standard of ordinary negligence applied.[29]

Hachette's argument that its relationship to the tortious book is "attenuated" mimics the same argument that its counsel (the same counsel who also represents Cutler and Hyperion) made on behalf of Hyperion at the oral argument in the appeal of the Arkansas Book Action.[30] During that argument, counsel for Cutler, Hyperion and Hachette argued that a book *publisher* is not liable for the acts of its authors. The Chief Judge of the Eighth Circuit expressed doubt as to this curious position, and counsel for Hyperion backed away from it.[31] The initial actions for Cutler's/Hyperion's/Hachette's counsel, however, are telling. When it comes to torts that protect the personal rights of individuals, counsel for Cutler/Hyperion/Hachette seems to believe that none of its clients are responsible.

---

[28] *Id.*

[29] *Id.* at 181. *See* SACK, Defamation, § 7.3.1 (discussing Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)). As indicated above, Hachette's appeal to cases such as those relating to the internet publishing—which enjoys a unique federal statutory protection—are simply inapposite here.

[30] Available at http://www.ca8.uscourts.gov/oralargs/oaFrame.html.

[31] *Id.*

**Defendant's Claim that Plaintiff Made Public the
Private Facts in the Book the *Washingtonienne* is False on its Face**

Defendant claims that by filing D.C. Action, Plaintiff has somehow waived the instant action. Notwithstanding that Hachette's position does not accurately describe the law, the instant action explicitly has stated causes of action, *inter alia*, for tortious statements in the book that are explicitly <u>not</u> in the blog. A simple review of the complaint in this case makes this clear:

At ¶ 20 of the Complaint, Plaintiff states:

20. Beginning on or about June 1, 2005 and thereafter, Defendant and others engaged in the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*. This book has the same title as, and tied to, the blog, "*Washingtonienne*." **The book is based upon Plaintiff's private facts never previously publicized**, which invaded Plaintiff's privacy-constitute a violation of Plaintiff's publicity and personality rights, and inflicted emotional distress.[32]

In addition, in ¶ 28, Plaintiff also averred:

28. Defendant's actions of publication, commercialization, and/or distribution of the book, constitute an invasion of Plaintiff's privacy, satisfying the elements of the tort of publication of private facts. **Defendant caused widespread publication and publicity of private intimate facts concerning Plaintiff that had not been publicized in Cutler's blog or elsewhere** in a manner that would be deemed outrageous and highly offensive to an ordinary reasonable person of average sensibilities, subjecting Plaintiff to severe emotional distress, humiliation, embarrassment, and anguish.[33]

Clearly, the D.C. Action does not in any way preclude the instant action.

---

[32] Complaint ¶ 20 (emphasis added).

[33] Complaint ¶ 28 (emphasis added).

The Complaint fully complied with the requirements of notice pleading contained in Rule 8 of the Federal Rules of Civil Procedure. In considering the sufficiency of pleadings, complaints are to be construed liberally in favor of the plaintiff.[34]

> We must review the complaint most favorably to the non-moving party and may dismiss "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." A motion to dismiss should be granted "as a practical matter . . . only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."[35]

The Complaint was more than sufficient to apprise Hachette that it had caused Plaintiff's injuries through its tortious actions.[36]

Moreover, even had, contrary to fact, the Complaint not made clear that "the book is based upon Plaintiff's private facts never previously publicized,"[37] logic would support the same conclusion. The blog was a few pages long. The book is a few hundred pages long. Of course, it should come as no surprise that the book contains tortious information not found in the blog. Indeed, Hyperion would not have paid Cutler $235,000 as an advance just to reprint the blog.[38] Rather, Hyperion paid Cutler to expand her tortious actions from the blog and create the book.[39] Hachette's failure to cite to this Court the above sections of the Complaint and to acknowledge that the instant case is not based on the blog, but rather the longer and newly-tortious book, border on inappropriate conduct.

---

[34] *Jenkins v. McKeithen*, 395 U.S. 411, 421-22 (1969).

[35] *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. Mo. 1995) (citations omitted).

[36] *BJC Health Systems v. Columbia Casualty Company,* 348 F.3d 685, 688 (8th Cir. 2003).

[37] Complaint ¶ 20 (emphasis added).

[38] Exhibit 1 (*see* page 3 of the Contract for the book the *Washingtonienne*).

[39] *Id.*

Further, Hachette is confused in its claim of a "defense" of prior disclosure of private facts. For example, in its discussion of false light, Hachette asserts that the filing of the D.C. Action vitiates any claims for false light. However, the claim of a "defense" of prior disclosure of private *facts*, by definition, does not apply of false light and defamation law; it could only possibly apply to disclosure of private *facts—i.e.*, true information, not false information. It is hornbook law that defamation (and false light) is always actionable, regardless of prior publication, because the statements are always false.[40] It is axiomatic that a plaintiff may bring a lawsuit for false light and defamation without granting license for others to make the same false accusations. Otherwise, if a person sued a defendant for, say, calling him an alcoholic, then anyone else could publicly accuse the plaintiff of being an alcoholic with impunity. Indeed, false light and defamation law are designed to do exactly the opposite.[41]

Moreover, Hachette's repeated references to cases discussing material previously disclosed in court are simply inapposite. First, as discussed, the book covers material *outside* the D.C. Action. Moreover, Hachette's cases regarding disclosures in court are more complex than Hachette recognizes. Cases cited by Hachette recognize *news organizations'* right to report on privacy litigation and the underlying facts. The problem with Hachette's argument is that the book was written *prior* to the filing of the D.C. Action and, as such, never made reference to the litigation that had not taken place at the time that the book was completed. Otherwise Hachette would have to argue that the book was written in the two

---

[40] *See, e.g., Hellar v. Bianco*, 111 Cal.App.2d 424, 244 P.2d 757 (1952) (republication of defamation equally actionable).

[41] *See id.*

weeks between the filing of the D.C. Action and Hachette's distribution of the book. Of course, Hachette knows this, and, therefore, has not alleged the contrary.

Hachette simply cannot rely on facts that were not disclosed at the time the book was written as a basis to assert that those facts had already been disclosed in court. Hachette's argument is illogical. Thus, Hachette was put on notice about the tortious nature of the book prior to its distribution on June 1, 2005 by the filing of the D.C Action on May 16, 2005 because the book was already written. Hachette is caught exactly in the middle of the timing of the completion of the book and the filing of the D.C. Action. Additionally, as discussed, Plaintiff's claim is also for false statements (defamation and false light), which are never diffused by prior publication.

### Hachette's Knowingly Misstates that the Book Contains Matters of Legitimate Public Interest

Hachette asserts that the book the *Washingtonienne* contains facts that are of legitimate public interest. Of course, the difficulty for Hachette is that it previously asserted that the book was purely fictional. Hachette vacillates regarding the facts as it sees fit. Hachette is free to allege legal theories in the alternative—but it cannot allege different facts and assert that they are all true. This is disingenuous and inappropriate.

Moreover, the District Court in the D.C. Action has already ruled that there is no legitimate public interest in the information about plaintiff's sex life and the information is not "newsworthy." Transcript of Motions Hearing Before the Honorable Paul L. Friedman United States District Judge, Wednesday, April 5, 2006, Page 52 line 22 to Page 54 line 9 ("**The argument that the defendant makes that there is a public interest in this kind of information I just reject. . . . The argument that the blog was newsworthy . . . I just**

**don't think carries the day here.").**[42]

As one court stated:

> While . . . the general criteria for determining newsworthiness are (a) the social value of the facts published; (b) the depth of the article's intrusion into ostensibly private affairs; and (c) the extent to which the individual voluntarily acceded to a position of public notoriety, the cases and authorities further explain that the paramount test of newsworthiness is whether the matter is of legitimate public interest which in turn must be determined according to the community mores. . . . *The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake*, with which a reasonable member of the public, with decent standards, would say that he had no concern.[43]

The District Court in the D.C. Action further stated: "Mr. Steinbuch's not a public figure. **So, I just reject the notion that the relationship between the two of them was a matter of public concern or interest, particularly the details the sex act they performed is just -- just doesn't carry the day at all. That's not a basis to dismiss.**" Transcript of Motions Hearing Before the Honorable Paul L. Friedman United States District Judge, Wednesday, April 5, 2006, Page 54 line 10-14) (emphasis added).[44]

Indeed, the Cutler herself has consistently maintained that her disclosures of her numerous sexual encounters are *not* of legitimate public interest. Cutler said "I just think it's so silly. The blog is really about a bunch of nobodies f***ing each other. I still can't believe people care."[45] Cutler told *Playboy* (for whom she unsurprisingly posed in sexually explicit pictures): "I wasn't doing anything that extraordinary . . . . None of these people [identified

---

[42] Exhibit 7.

[43] *Sipple v. Chronicle Publishing Co.*, 154 Cal. App. 3d 1040, 1048-49 (italics in original, underline added, citation omitted).

[44] Exhibit 7.

[45] http://www.wonkette.com/archives/washingtonienne-speaks-wonkette-exclusive-must-credit-wonkette-the-washingtonienne-interview-009693.php

in the X-rated blog] were elected officials, so they don't deserve the scrutiny. . . . [Otherwise,] I would have tried to cash in on that earlier."[46]

The book, which adds more private information—and defamatory material—to the blog is equally unprotected. Notwithstanding Hachette's obvious (and apparently intentional) misstatement of the law that sexual intimacies are of legitimate public interest (discussed below), it remains hornbook law that "[s]exual relations, for example, are normally entirely private matters . . . . [Even regarding a] public figure, [t]here may be some intimate details of [,say, a motion picture actress'] life, such as sexual relations, which even the actress is entitled to keep to herself."[47] As another court stated:

> We are aware the disclosure of sexual and other such intimate information about even the most public of figures is often not considered newsworthy because it usually has nothing to do with that person's public life, and thus may not be considered of any legitimate concern to the public. Likewise, where involuntary public figures are involved, information of a sexual or intimate nature usually is unrelated to the general topic legitimately within the public's interest.[48]

As yet another court stated regarding similar facts—but for a public figure, no less:

> IEG contends that the wide distribution of a different videotape, one depicting sexual relations between Lee and her husband Tommy Lee, negates any privacy interest that Lee might have in the [new] Tape depicting sexual relations with Michaels. The facts depicted on the Tommy Lee tape, however, are different from the facts depicted on the Michaels Tape. Sexual relations are among the most personal and intimate of acts. The Court is not prepared to conclude that public exposure of one sexual encounter forever removes a person's privacy interest in all subsequent and previous sexual encounters.

> It is also clear that Michaels has a privacy interest in his sex life. While Michael's voluntary assumption of fame as a rock star throws open his

---

[46] *Internal Affairs*, Playboy (online), September 8, 2004 (Exhibit 8).

[47] *Doe v. Mills*, 212 Mich. App. 73, 82 (Mich. Ct. App. 1995).

[48] *Sipple v. Chronicle Publishing Co.*, 154 Cal. App. 3d. at 1077.

private life to some extent, even people who voluntarily enter the public sphere retain a privacy interest in the most intimate details of their lives.[49]

Like the defendant in *Michaels*, Hachette "attempt[s] to blur in its papers"[50] the difference between the legitimate public interest in the *lawsuits* and the absolute lack of a legitimate public interest in Plaintiff's private sexual matters.[51]  Reference to law review articles (which support even broader rights of privacy than even Plaintiff has asserted, and far broader than what Hachette acknowledges)[52] and the D.C. court's reference to media interest in the *lawsuit*, simply have no relation to Hachette's knowing distribution of Plaintiff's private facts and Hachette's knowing distribution of false statements about Plaintiff.

Equally offensive to the book's improper disclosure of private information is its inclusion of defamatory material.  For example, the book takes the fact that Plaintiff does not recreationally drink alcohol, and used this fact to state that Plaintiff is a recovering alcoholic. This is definitely <u>not</u> true.  But not only is the statement that Plaintiff is a recovering alcoholic highly offensive, by mixing it with the fact that Plaintiff does not recreationally drink alcohol, the book makes such a defamatory statement even more harmful.

Indeed, Hachette has actually *never* stated what in the *Washingtonienne* is of a legitimate public interest.   The one case that Hachette cites for its claim of public interest actually holds the *opposite* of what Hachette suggests:

> Illinois has been a follower rather than a leader in recognizing claims of invasion of privacy. . . . .
> Does it follow . . . that a journalist who wanted to write a book about contemporary sexual practices could include the intimate details of named

---

[49] *Michaels v. Internet Ent. Group*, 5 F. Supp. 2d 823, 840 (C.D. Cal. 1998).

[50] *Id.* at 842.

[51] *Id.*

[52] *See* Hachette's Br. at 9 n.4.

living persons' sexual acts without the persons' consent? Not necessarily . . . . The core of the branch of privacy law with which we deal in this case is the protection of those intimate physical details the publicizing of which would be not merely embarrassing and painful but deeply shocking to the average person subjected to such exposure. The public has a legitimate interest in sexuality, <u>but</u> that interest may be outweighed in such a case by the injury to the sensibilities of the persons made use of by the author in such a way. At least the balance would be sufficiently close to <u>preclude</u> summary judgment for the author and publisher.[53]

Thus, the *very case* that Hachette cites, explicitly states that a book that discussed private sexual matters would *not* be subject to summary judgment for the defendant—no less a motion to dismiss for the defendant. That alone precludes Hachette's sought relief. Indeed, *every* case that Hachette cites states that details of individuals' intimate physical and sexual details are *never* themselves of legitimate public concern. As the Seventh Circuit held: "[t]he reader of a book about the black migration to the North would have no legitimate interest in the details of Luther Haynes's sex life."[54]

Hachette is hamstrung by the fact that the book, the *Washingtonienne*, has nothing else to put forward—no redeeming social value whatsoever. Cutler's sole claim to fame is her surreptitious prostitution and drug use. In fact, apparently the sexually-charged cover of the book the *Washingtonienne* is so shocking to Cutler's/Hyperion's/Hachette's own counsel, that when it is sent within Defendants' law firm to at least one senior partner, the explicit images are intentionally covered with a post-it.

Finally, "[i]f there is room for differing views whether a publication would be newsworthy the question is one to be determined by the jury and not the court."[55]

---

[53] *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1234-1235 (7th Cir. 1993) (citations omitted).

[54] *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1232 (7th Cir. Ill. 1993).

[55] *Times-Mirror Co. v. Superior Court*, 198 Cal. App. 3d 1420, 1428-1429 (Cal. Ct. App. 1988) (court found that witness' name in murder case is not newsworthy).

**Plaintiff Has Stated a Claim for Misappropriation
and a Violation of His Publicity and Personality Rights**

Plaintiff has stated a claim for misappropriation and a violation of his publicity and

personality rights. The Complaint states:

20. Beginning on or about June 1, 2005 and thereafter, Defendant and others engaged in the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*. This book has the same title as, and tied to, the blog, "*Washingtonienne*." The book is based upon Plaintiff's private facts never previously publicized, which invaded Plaintiff's privacy-constitute a violation of Plaintiff's publicity and personality rights, and inflicted emotional distress.

21. Defendant also placed Plaintiff in a false light and defamed him through the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*, by making false, harmful, and defamatory assertions about him.

22. This Court has ruled that Arkansas is a Multiple-Publication Rule jurisdiction.

23. According to Hyperion, a publisher of the book, the book is an "utterly unrepentant roman a clef exposing the scandalous truth. . . . [Cutler] uses her 'real life experience. . . for a sexy, semi-autographical novel that is sure to initiate a . . . game of Who's Who.'"

24. Cutler commented in the press that she feels sorry for those people that write blogs for years and never obtain a book deal.

25. In responding to what she has done with her new found wealth resulting from her lucrative book deal, Cutler says "I guess you can buy more drugs."

     b. Misappropriation-Violation of Publicity, Violation of Personality Rights

32. Plaintiff repeats the previous paragraphs here.

33. Through Defendant's actions of publication, commercialization, and/or distribution the book, Defendant misappropriated Plaintiff's likeness and identity in the text of and acts of publication, commercialization, and/or distribution of the book subject to this lawsuit. Defendant profited from this misappropriation without the consent of or compensation to Plaintiff.

34. Through Defendant's actions of publication, commercialization, and/or distribution the book, Defendant violated Plaintiff's publicity rights through the text of and acts of publication, commercialization, and/or distribution of the book subject to this lawsuit. Defendant profited from this misappropriation without the consent of or compensation to Plaintiff.

35. Through Defendant's actions of publication, commercialization, and/or distribution the book, Defendant violated Plaintiff's personality rights through the text of and acts of publication, commercialization, and/or distribution of the book subject to this lawsuit. Defendant profited from this misappropriation without the consent of or compensation to Plaintiff.

36. These actions have caused Plaintiff to suffer severe emotional distress, humiliation, embarrassment, anguish, pain and suffering and have damaged him relative to his community.

This more than states a cause of action for misappropriation and a violation of his publicity and personality rights. The Complaint fully complied with the requirements of notice pleading contained in Rule 8 of the Federal Rules of Civil Procedure. In considering the sufficiency of pleadings, complaints are to be construed liberally in favor of the plaintiff.[56] Thus, the question is not whether a plaintiff pled *all* facts concerning the causes of action properly asserted in the complaint, but whether any evidence or facts *could* support a judgment on any of those claims.[57]

> We must review the complaint most favorably to the non-moving party and may dismiss "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." A motion to dismiss should be granted "as a practical matter . . . only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."[58]

The Complaint was sufficient to apprise Hachette that it had caused Plaintiff's

---

[56] *Jenkins v. McKeithen*, 395 U.S. 411, 421-22 (1969).

[57] *Id.*

[58] *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. Mo. 1995) (citations omitted).

injuries through it's tortious actions.[59]

Moreover, Plaintiff refers the Court to the following salient facts that actually *prove* liability. As discussed, Hyperion advertised the book as:

> [a] *sharp*, steamy, utterly unrepentant roman à clef exposing the scandalous <u>truth</u> of what goes on in the corridors of power on Capitol Hill, *based on the author's actual weblog of the same name.* Washington, D.C., staffer Jessica Cutler created a sensation last year when, in an on-line weblog meant just for friends, she began chronicling her late-night affairs with Washington power brokers. But word about her dishy and humorous account of her relationships with six different men on Capitol Hill inevitably spread around town and became such a hot topic that it got her fired from her entry-level job in <u>the office of Senator Mike DeWine (an Ohio Republican)</u>. Now, in *The Washingtonienne*, *Cutler's real-life experiences* in the capital become fodder for a sexy, *semi-autobiographical* novel that *is sure to initiate a new Washington parlor game of Who's Who.*

> …to the staff counsel [i.e., Plaintiff], whose taste for spanking she "accidentally" leaks . . . [the] <u>loosely fictionalized</u> exploits serve up large portions of D.C. dish.[60]

Indeed, not only did the publisher advertise the book as true, it invited readers to determine exactly who is depicted in the book and specifically identified Plaintiff.

Also, a "roman a clef" is defined as "Novel that has the extraliterary interest of portraying identifiable people more or less **thinly disguised** as fictional characters,"[61] and Wikipedia itself describes as a notable example of a "roman a clef" as "*The Washingtonienne* (2005) based on the author Jessica Cutler's sexual affairs as a congressional intern with various men in Washington, D.C."[62] The book took great pains to identify Plaintiff in the book. While Defendant asserts that the book changed the name of Plaintiff, Defendant

---

[59] *BJC Health Systems v. Columbia Casualty Company,* 348 F.3d 685, 688 (8th Cir. 2003).

[60] Exhibit 2 (emphasis added).

[61] http://encyclopedia2.thefreedictionary.com/roman+%C3%A0+clef (emphasis added).

[62] http://en.wikipedia.org/wiki/Roman_%C3%A0_clef.

conveniently failed to disclose that the book simply replaced Plaintiff's name with that of his deceased father. Moreover, "the use of pseudonyms would not have gotten Lemann and Knopf [the author and publisher of a book] off the legal hook. [Because t]he details of the [plaintiffs'] lives recounted in the book would identify them unmistakably to anyone who has known the [plaintiffs] well for a long time (members of their families, for example), or who knew them before they got married; *and no more is required* for liability either in defamation law or in privacy law."[63] Indeed, given just these facts alone, this Court can as a matter of law find that the book was advertised based on (misappropriating) Plaintiff's likeness and violating his publicity and personality rights.

## Plaintiff Has Stated a Claim for Defamation

Plaintiff has stated a claim for defamation. The Complaint states:

26. Beginning on or about June 1, 2005 and thereafter, Defendant and others engaged in the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*. This book has the same title as, and tied to, the blog, *"Washingtonienne."* The book is based upon Plaintiff's private facts never previously publicized, which invaded Plaintiff's privacy-constitute a violation of Plaintiff's publicity and personality rights, and inflicted emotional distress.

27. Defendant also placed Plaintiff in a false light and defamed him through the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*, by making false, harmful, and defamatory assertions about him.

28. This Court has ruled that Arkansas is a Multiple-Publication Rule jurisdiction.

29. According to Hyperion, a publisher of the book, the book is an "utterly unrepentant roman a clef exposing the scandalous truth. . . . [Cutler] uses her 'real life experience. . . for a sexy, semi-autographical novel that is sure to initiate a . . . game of Who's Who.'"

30. Cutler commented in the press that she feels sorry for those people that write blogs for years and never obtain a book deal.

---

[63] *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1233 (7th Cir. Ill. 1993) (emphasis added).

31. In responding to what she has done with her new found wealth resulting from her lucrative book deal, Cutler says "I guess you can buy more drugs."

### f. Defamation

43. Plaintiff repeats the previous paragraphs here.

44. Defendant defamed Plaintiff.

45. Defendant conveyed false and harmful statements of fact and used defamatory language regarding Plaintiff.

46. Some or all of these statements would fall under the category of per se defamation.

47. These false statements were reasonably calculated to cause Plaintiff harm.

48. These statements were made and/or repeated intentionally, negligently, and/or with actual malice and conscious indifference to Plaintiff's rights and the consequences to Plaintiff.

49. These actions have caused Plaintiff to suffer severe emotional distress, humiliation, embarrassment, anguish, pain and suffering and have damaged him relative to the community, inter alia, regarding his reputation, character, and/or esteem. Plaintiff has suffered economic damages and losses and physical and mental distress. Plaintiff ha suffered actual damages, which exceed the diversity jurisdiction limits.

The book is defamatory. For example, the book takes the fact that Plaintiff does not recreationally drink alcohol, and used this fact to state that Plaintiff is a recovering alcoholic. This is definitely not true. But not only is the statement that Plaintiff is a recovering alcoholic highly offensive, by mixing it with the fact that Plaintiff does not recreationally drink alcohol, the book makes such a defamatory statement even more harmful.

This more than states a cause of action for defamation. Thus, the question is not whether a plaintiff plead *all* facts concerning the causes of action properly asserted in the

complaint, but whether any evidence or facts *could* support a judgment on any of those claims.

> We must review the complaint most favorably to the non-moving party and may dismiss "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." A motion to dismiss should be granted "as a practical matter . . . only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."[64]

## Plaintiff Has Stated a Claim for False Light

Plaintiff has stated a claim for false light. The Complaint states:

32. Beginning on or about June 1, 2005 and thereafter, Defendant and others engaged in the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*. This book has the same title as, and tied to, the blog, "*Washingtonienne*." The book is based upon Plaintiff's private facts never previously publicized, which invaded Plaintiff's privacy-constitute a violation of Plaintiff's publicity and personality rights, and inflicted emotional distress.

33. Defendant also placed Plaintiff in a false light and defamed him through the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*, by making false, harmful, and defamatory assertions about him.

34. This Court has ruled that Arkansas is a Multiple-Publication Rule jurisdiction.

35. According to Hyperion, a publisher of the book, the book is an "utterly unrepentant roman a clef exposing the scandalous truth. . . . [Cutler] uses her 'real life experience. . . for a sexy, semi-autographical novel that is sure to initiate a . . . game of Who's Who.'"

36. Cutler commented in the press that she feels sorry for those people that write blogs for years and never obtain a book deal.

---

[64] *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. Mo. 1995) (citations omitted).

37. In responding to what she has done with her new found wealth resulting from her lucrative book deal, Cutler says "I guess you can buy more drugs."

## c. False Light

21. Plaintiff repeats the previous paragraphs here.

22. Through Defendant's actions of publication, commercialization, and/or distribution the book, the Washingtonienne, Defendant portrayed Plaintiff falsely and disparagingly, putting him in false light, causing him harm.

23. These actions have caused Plaintiff to suffer severe emotional distress, humiliation, embarrassment, anguish, pain and suffering and have damaged him relative to his community.

The book puts Plaintiff in a false light. For example, the book takes the fact that Plaintiff does not recreationally drink alcohol, and used this fact to state that Plaintiff is a recovering alcoholic. This is definitely not true. But not only is the statement that Plaintiff is a recovering alcoholic highly offensive, by mixing it with the fact that Plaintiff does not recreationally drink alcohol, the book makes such a defamatory statement even more harmful.

This more than states a cause of action for false light. Thus, the question is not whether a plaintiff pled *all* facts concerning the causes of action properly asserted in the complaint, but whether any evidence or facts *could* support a judgment on any of those claims.

> We must review the complaint most favorably to the non-moving party and may dismiss "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." A motion to dismiss should be granted "as a practical matter . . . only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."[65]

---

[65] *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. Mo. 1995) (citations omitted).

**Plaintiff Has Stated a Claim for Public Disclosure of Private Facts**

Plaintiff has stated a claim for public disclosure of private facts. The Complaint states:

26. Beginning on or about June 1, 2005 and thereafter, Defendant and others engaged in the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*. This book has the same title as, and tied to, the blog, *"Washingtonienne."* The book is based upon Plaintiff's private facts never previously publicized, which invaded Plaintiff's privacy-constitute a violation of Plaintiff's publicity and personality rights, and inflicted emotional distress.

27. Defendant also placed Plaintiff in a false light and defamed him through the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*, by making false, harmful, and defamatory assertions about him.

28. This Court has ruled that Arkansas is a Multiple-Publication Rule jurisdiction.

29. According to Hyperion, a publisher of the book, the book is an "utterly unrepentant roman a clef exposing the scandalous truth. . . . [Cutler] uses her 'real life experience. . . for a sexy, semi-autographical novel that is sure to initiate a . . . game of Who's Who.'"

30. Cutler commented in the press that she feels sorry for those people that write blogs for years and never obtain a book deal.

31. In responding to what she has done with her new found wealth resulting from her lucrative book deal, Cutler says "I guess you can buy more drugs."

   a. Public Disclosure of Private Facts

27. Plaintiff repeats the previous paragraphs here.

28. Defendant's actions of publication, commercialization, and/or distribution of the book, constitute an invasion of Plaintiff's privacy, satisfying the elements of the tort of publication of private facts. Defendant caused widespread publication and publicity of private intimate facts concerning Plaintiff that had not been publicized in Cutler's blog or elsewhere in a manner that would be deemed outrageous and highly offensive to an ordinary reasonable person of average sensibilities, subjecting Plaintiff to severe emotional distress, humiliation, embarrassment, and anguish.

29. These disclosures were not made for any purposes relating to the dissemination of news or material published in the public interest and of no legitimate public concern. These disclosures were cruel and malicious exposures of the most intimate details of Plaintiff's private life to the public.

30. These disclosures of private facts would be highly offensive to any reasonable person.

31. The invasions of privacy have caused Plaintiff to suffer severe emotional distress, humiliation, embarrassment, anguish, pain and suffering and have damaged him relative to his community.

This more than states a cause of action for false light. Thus, the question is not whether a plaintiff pled *all* facts concerning the causes of action properly asserted in the complaint, but whether any evidence or facts *could* support a judgment on any of those claims.

> We must review the complaint most favorably to the non-moving party and may dismiss "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." A motion to dismiss should be granted "as a practical matter . . . only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."[66]

Moreover, Plaintiff refers the Court to the following salient facts that actually prove liability.

Hyperion advertised the book as:

[a] *sharp*, steamy, utterly unrepentant roman à clef exposing the scandalous truth of what goes on in the corridors of power on Capitol Hill, *based on the author's actual weblog of the same name.* Washington, D.C., staffer Jessica Cutler created a sensation last year when, in an on-line weblog meant just for friends, she began chronicling her late-night affairs with Washington power brokers. But word about her dishy and humorous account of her relationships with six different men on Capitol Hill inevitably spread around town and became such a hot topic that it got her fired from her entry-level job in the office of Senator Mike DeWine (an

---

[66] *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. Mo. 1995) (citations omitted).

Ohio Republican). Now, in *The Washingtonienne*, *Cutler's real-life experiences* in the capital become fodder for a sexy, *semi-autobiographical* novel that *is sure to initiate a new Washington parlor game of Who's Who.*

...to the staff counsel [i.e., Plaintiff], whose taste for spanking she "accidentally" leaks . . . [the] loosely fictionalized exploits serve up large portions of D.C. dish.[67]

Indeed, not only did the publisher advertise the book as a true depiction of Plaintiff's (and others') private facts, it invited readers to determine exactly who is depicted in the book and specifically identified Plaintiff.

Wikipedia itself describes as a notable example of a "roman a clef" as "*The Washingtonienne* (2005) based on the author Jessica Cutler's sexual affairs as a congressional intern with various men in Washington, D.C."[68] A "roman a clef" is defined as "[n]ovel that has the extraliterary interest of portraying identifiable people more or less thinly disguised as fictional characters."[69] The book took great pains to identify Plaintiff. While Defendant asserts that the book changed the name of Plaintiff, Defendant conveniently failed to disclose that the book simply replaced Plaintiff's name with that of his deceased father. Indeed, this Court can as a matter of law find that the book disclosed Plaintiff's private facts.

**Plaintiff Has Stated a Claim for Intrusion Upon Seclusion**

Plaintiff has stated a claim for intrusion upon seclusion. The Complaint states:

26. Beginning on or about June 1, 2005 and thereafter, Defendant and others engaged in the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*. This book has the same title as, and tied to, the blog, "*Washingtonienne*." The book is based upon Plaintiff's private facts never previously publicized, which invaded

---

[67] Exhibit 2 (emphasis added).

[68] http://en.wikipedia.org/wiki/Roman_%C3%A0_clef.

[69] http://encyclopedia2.thefreedictionary.com/roman+%C3%A0+clef (emphasis added).

27. Defendant also placed Plaintiff in a false light and defamed him through the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*, by making false, harmful, and defamatory assertions about him.

28. This Court has ruled that Arkansas is a Multiple-Publication Rule jurisdiction.

29. According to Hyperion, a publisher of the book, the book is an "utterly unrepentant roman a clef exposing the scandalous truth. . . . [Cutler] uses her 'real life experience. . . for a sexy, semi-autographical novel that is sure to initiate a . . . game of Who's Who.'"

30. Cutler commented in the press that she feels sorry for those people that write blogs for years and never obtain a book deal.

31. In responding to what she has done with her new found wealth resulting from her lucrative book deal, Cutler says "I guess you can buy more drugs."

d. Intrusion Upon Seclusion

24. Plaintiff repeats the previous paragraphs here.

25. Through Defendant's actions of publication, commercialization, and/or distribution the book, the *Washingtonienne*, Defendant's actions intruded upon Plaintiff's right to seclusion.

26. These actions have caused Plaintiff to suffer severe emotional distress, humiliation, embarrassment, anguish, pain and suffering and have damaged him relative to his community.

This more than states a cause of action for intrusion upon seclusion. Thus, the question is not whether a plaintiff pled *all* facts concerning the causes of action properly asserted in the complaint, but whether any evidence or facts *could* support a judgment on any of those claims.

We must review the complaint most favorably to the non-moving party and may dismiss "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." A motion to dismiss should be granted "as a practical matter . . . only in the unusual case in which a plaintiff includes allegations that show on the face

of the complaint that there is some insuperable bar to relief."[70]

Moreover, Plaintiff refers the Court to the following salient facts that actually prove liability.

Hyperion advertised the book as:

> [a] *sharp*, steamy, utterly unrepentant roman à clef exposing the scandalous <u>truth</u> of what goes on in the corridors of power on Capitol Hill, *based on the author's actual weblog of the same name*. Washington, D.C., staffer Jessica Cutler created a sensation last year when, in an on-line weblog meant just for friends, she began chronicling her late-night affairs with Washington power brokers. But word about her dishy and humorous account of her relationships with six different men on Capitol Hill inevitably spread around town and became such a hot topic that it got her fired from her entry-level job in <u>the office of Senator Mike DeWine (an Ohio Republican)</u>. Now, in *The Washingtonienne*, *Cutler's real-life experiences* in the capital become fodder for a sexy, *semi-autobiographical* novel that *is sure to initiate a new Washington parlor game of Who's Who*.
>
> ...to the staff counsel [i.e., Plaintiff], whose taste for spanking she "accidentally" leaks . . . [the] <u>loosely fictionalized</u> exploits serve up large portions of D.C. dish.[71]

Indeed, not only did the publisher advertise the book as true, it invited readers to determine exactly who is depicted in the book and specifically identified Plaintiff.

### Actual Malice, While Not Necessary, Has Been Pled

Hachette claims that Plaintiff has not alleged malice. Again, Hachette apparently has failed to actually read the Complaint that it seeks to dismiss.

> 58. Plaintiff is entitled to punitive damages in response to Defendant's reckless, **malicious**, intentional, and wanton conduct.

Complaint ¶ 58 (emphasis added).

> 29. These disclosures were not made for any purposes relating to the dissemination of news or material published in the public interest and of no legitimate public concern. These disclosures were cruel and **malicious** exposures of the most intimate details of Plaintiff's private life to the public.

---

[70] *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. Mo. 1995) (citations omitted).

[71] Exhibit 2 (emphasis added).

Complaint ¶ 29 (emphasis added).

> 48. These statements were made and/or repeated intentionally, negligently, and/or with **actual malice** and conscious indifference to Plaintiff's rights and the consequences to Plaintiff.

Complaint ¶ 48 (emphasis added).

Nonetheless, the standard applicable here is not that of actual malice, but merely ordinary negligence. Plaintiff is neither a public figure—as Hachette concedes—nor does the book cover matters of legitimate public interest. Transcript of Motions Hearing Before the Honorable Paul L. Friedman United States District Judge, Wednesday, April 5, 2006, Page 52 line 22 to Page 54 line 9-14 ("The argument that the defendant makes that there is a public interest in this kind of information I just reject. . . . The argument that the blog was newsworthy . . . I just don't think carries the day here. . . . Mr. Steinbuch's not a public figure. So, I just reject the notion that the relationship between the two of them was a matter of public concern or interest, particularly the details the sex act they performed is just -- just doesn't carry the day at all. That's not a basis to dismiss.").[72] The book is indisputably an expansion of the blog—indeed, employing exactly the same title, the *Washingtonienne*.[73] As such, Plaintiff is under no obligation to prove malice whatsoever.[74]

---

[72] Exhibit 7.

[73] Exhibit 1 (Contract for the book).

[74] *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985). See Rodney Smolla, Law of Defamation § 3.02[5] (stating that under *Dun & Bradstreet*, applies to fault and damages, and, as such, strict liability exists for defamation when the plaintiff is a private person and the issue under discussion is not one of public concern).

## Conclusion

For the foregoing reasons, Hachette's motion should be denied and Plaintiff should be afforded his right to legal redress.

December 15, 2008

Robert Steinbuch
Plaintiff
6834 Cantrell Rd., #222
Little Rock, AR 72207
(718) 673-4393
robertsteinbuch@gmail.com

## CERTIFICATE OF SERVICE

Plaintiff served the attached motion by causing it to be mailed via US mail on defendant on December 15, 2008 at:

Philip Anderson et al.
Williams & Anderson
111 Center St.
Little Rock, AR 72201

In addition, plaintiff's filing will result in defendant also receiving service through the ECF system.

Robert Steinbuch