**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

MAY 0 8 2009

JAMES W. McCORMACK CLERK
By: _____ DEP CLERK

---------------------------------------------

Robert Steinbuch               :Index No.: 4-08-cv-0456-JLH
           **Plaintiff,** *Pro Se*     : (Chief Judge Leon Holmes)
                                    :
     -v-                           :
                                      :
Hachette Book Group, AKA Hatchette Book : 
Group                                   :
           **Defendant.**            :

---------------------------------------------

## <u>MOTION TO AMEND</u>

Pursuant to this Court's order, plaintiff, appearing *pro se*, moves to amend its complaint consistent with the opinion of the Court. As such, plaintiff describes the conduct by Hachette that is so extreme and outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, alleges that the plaintiff suffered emotional distress so severe that no reasonable person could be expected to endure it, identifies specific defamatory statements, pleads facts supporting actual damage to his reputation, makes specific allegations as to how the book casts him in a false light, describes actions on the defendant's part in the nature of prying or intrusion that is offensive or objectionable to a reasonable person, alleges in a detailed fashion the misappropriation of plaintiff's name or likeness, and makes specific allegations of facts demonstrating either defendant's actual knowledge of the tortious nature of the book or facts giving rise to a duty to investigate.

The proposed Amended Complaint is attached. Defendant has not answered any complaint in this case. Defendant can suffer no prejudice in having the complaint amended. Plaintiff prays that this Court will grant the relief requested and allow plaintiff to amend his complaint and order the Clerk of the Court to file the attached Amended Complaint in this case.

May 8, 2009

Robert Steinbuch
Plaintiff, *Pro Se*
6834 Cantrell Rd., #222
Little Rock, AR 72207
(718) 673-4393

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

---------------------------------------------------------------

| | |
|---|---|
| **Robert Steinbuch** | : **Index No.: 4:08-cv-00456-JLH** |
|        **Plaintiff,** *pro se* | :    **Chief Judge Leon Holmes** |
| | : |
| **-v-** | : |
| | : |
| **Hachette Book Group, AKA Hatchette Book** | : |
| **Group** | : |
|        **Defendant.** | : |

---------------------------------------------------------------

## AMENDED COMPLAINT

1. This action is for invasion of privacy, violation of publicity and personality rights, defamation of character, and infliction of emotional distress caused by the publication, commercialization, and/or distribution of a book by the defendant describing, *inter alia,* the graphic detail the intimate amorous and sexual relations of the plaintiff, misappropriating plaintiff's likeness, violating plaintiff's publicity and personality rights, putting plaintiff in false light, defaming plaintiff, disclosing plaintiff's private facts, intruding on plaintiff's seclusion, and intentionally inflicting emotional distress on plaintiff, subjecting plaintiff to humiliation and anguish beyond that which any reasonable person is required to bear under the law, that is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and that would shock the conscience of any reasonable person.

2. Defendant's actions of publication, commercialization, and/or distribution of the book the *Washingtonienne* (the "book") resulted in harm to plaintiff.

3. At all relevant times, the plaintiff has been a citizen and/or resident of Arkansas.

4. Defendant is an out-of-state resident.

5. Plaintiff appears *pro se*.

6. Plaintiff demands a jury trial.

7. Jurisdiction is founded on diversity of citizenship and amount in controversy.

8. At all relevant times, plaintiff has been a citizen and/or resident of Arkansas.

9. Defendant is not a resident and/or citizen of Arkansas.

10. Defendant's actions of publication, commercialization, and/or distribution of the book resulting in the harm to plaintiff in Arkansas gives rise to specific personal jurisdiction in this Court over defendant.

11. Defendant's ongoing, continuous, and systematic contacts with Arkansas gives rise to general personal jurisdiction in this Court over defendant.

12. Defendant concedes personal jurisdiction.

13. The matter in controversy exceeds, exclusive of interests and costs, the sum of $75,000.

14. The harm giving rise to the claims herein are in, *inter alia*, Arkansas.

15. In May 2004, Jessica Cutler published a "blog," an Internet site, on which she added periodic entries. She entitled the blog "*Washingtonienne*." Defendant knew or should have known this.

16. That blog is the subject of a separate and distinct litigation in Washington D.C (the "D.C. Action). Defendant knew or should have known this.

17. The D.C. Action explicitly put on notice defendant that the book is tortious before defendant distributed the book.

18. Cutler is an admitted prostitute and illegal drug user. Defendant knew or should have known this from, *inter alia*, Cutler's widely publicized public statements and the D.C. Action.

19. Cutler's X-rated blog described in graphic detail her ongoing sexual relationships with six men, including plaintiff. Defendant knew or should have known this from, *inter alia*, Cutler's widely publicized public statements and the D.C. Action.

20. Cutler intentionally made her "*Washingtonienne*" blog notorious and widely publicized throughout the world with the intention of getting a book deal therefrom. Defendant knew or should have known this from, *inter alia*, Cutler's widely publicized public statements and the D.C. Action.

21. Cutler said: "With a blog, you can't expect your private life to be private anymore." Defendant knew or should have known this from, *inter alia*, Cutler's widely publicized public statements and the D.C. Action.

22. At the time of his relationship with Cutler, plaintiff did not know that Cutler was simultaneously engaged in sexual relationships with five other men and that she was prostituting herself and taking illegal drugs.

23. Plaintiff did not know that Cutler was recording the details of her relationship with plaintiff on her blog. Defendant knew or should have known this from, *inter alia*, Cutler's widely publicized public statements and the D.C. Action.

24. Defendant Cutler put plaintiff's name and other identifying information about plaintiff in her blog. Defendant knew or should have known this from, *inter alia*, Cutler's widely publicized public statements and the D.C. Action.

25. Defendant knew or should have known of the tortious nature of Cutler's blog as a result of the D.C. Action.

26. Cutler said: "Some people with blogs are never going to get famous, and they've been doing it for, like, over a year. I feel bad for them." Defendant knew or should have known this from, *inter alia*, Cutler's widely publicized public statements and the D.C. Action.

27. Cutler conspired with defendant and others to write and distribute a book that violated plaintiff's rights.

28. Cutler signed a deal with *Playboy Magazine* which included a totally nude photo spread of Cutler posted on Playboy's Internet site, capitalizing on the publicity generated by her blog and her relationship with plaintiff. Defendant should have known this from, *inter alia*, Cutler's widely publicized statements and the D.C. Action.

29. Cutler then signed a book contract, contracting for a six-figure advance, with Hyperion Press, a division of the Disney Empire, to write a "thinly disguised" book, of the *roman a clef* genre, in which, *inter alia*, the details of her relationship with plaintiff are described in graphic fashion. Defendant should have known this from, *inter alia*, Cutler's widely publicized statements and the D.C. Action.

30. Defendant was aware that the book was only "thinly disguised" truth and invaded plaintiff's rights. Defendant should have known this from, *inter alia*, Cutler's widely publicized statements and the D.C. Action.

31. Plaintiff filed the D.C. Action, pursuant to his Constitutional rights under the First and Fourteenth Amendments, because Cutler committed several torts against

plaintiff, including violating his right to privacy, by writing an internet website ("weblog" or "blog") exposing plaintiff's private and personal facts and telling falsehoods about him. The blog was entitled—the *Washingtonienne*. Defendant knew or should have known this.

32. Cutler invented the title the *Washingtonienne*. Defendant should have known this from, *inter alia,* Cutler's widely publicized statements and the D.C. Action.

33. Defendant Cutler filed several motions to dismiss in the D.C. Action, and the D.C. District Court denied each and every one of those motions to dismiss. Defendant should have known this from, *inter alia,* Cutler's widely publicized statements and the D.C. Action.

34. Cutler's ill-gotten booty from her six-figure book deal, as well as her other exploits—such having recently been linked to the prostitution ring that serviced the then-Governor of New York[1]—apparently did not sustain the lifestyle that she desired.[2] So Cutler filed for bankruptcy.

35. Cutler's creditors include the United States Treasury and the New York State Treasury, for Cutler's failure to pay taxes on her significant income garnered from her tortious behavior, no less her prostitution.

36. Plaintiff filed an action in this Court for the torts occasioned by the continued exploitation of, and injury to, plaintiff through the publication of the privacy-invading and otherwise tortious book.

---

[1] *See* Eane MacIntosh and Chuck Bennett, "MADAM" LINK TO DC VIXEN: PROBERS SEEK SENATE SCANDAL GAL, New York Post (March 28, 2008), available at: http://www.nypost.com/seven/03282008/news/regionalnews/madam_link_to_dc_vixen_103854.htm. See Appendix.

[2] In responding to what she has done with her new found wealth resulting from her lucrative book deal, Cutler said "I guess you can buy more drugs."

37. The book is identically entitled to the blog—both called the *Washingtonienne*. Defendant should have known this from, *inter alia*, Cutler's widely publicized statements and the D.C. Action.

38. Cutler also wrote a sexually explicit document a year prior to the blog entitled the *Washingtonienne* as part of her plan to get a book deal. Defendant knew or should have known this.

39. Defendants attack plaintiff and attempt to diminish his injuries, in an ongoing attempt to blame the victim for the harm that they have caused and for which they would undoubtedly object had such indignation been brought on themselves, their families, or their children.

40. Cutler's contract with the Disney publishing company Hyperion *required* the book to be based on and an expansion of her real-life, tortious blog that was subject to suit for violating plaintiff's rights. Defendant should have known this from, *inter alia*, Cutler's widely publicized statements and the D.C. Action. Defendant did read or should have read the contract, particularly given the prior litigation resulting from the blog.

41. In her blog on which the book was *required* to be based, Cutler makes clear that plaintiff values highly his privacy. Defendant should have known this from, *inter alia*, Cutler's widely publicized statements and the D.C. Action. Defendant did read or should have read the book, particularly given the prior litigation resulting from the blog on which defendant knew or should have known was the basis of the book.

42. The contract *required* that the book contain factual information about plaintiff that would invade his privacy and otherwise violate his rights. Defendant should have known this from, *inter alia,* Cutler's widely publicized statements and the D.C. Action. Defendant did read or should have read the contract, particularly given the prior litigation resulting from the blog.

43. The Contract for the book—on the very first page—explicitly states "The *Washingtonienne* is a roman a clef . . . based on the author's real life social and sexual escapades as recorded in her scandal inducing blog, *Washingtonienne*." Defendant should have known this from, *inter alia,* Cutler's widely publicized statements and the D.C. Action. Defendant did read or should have read the contract, particularly given the prior litigation resulting from the blog.

44. According to the advertisement for the book, it is an "utterly unrepentant <u>roman a clef</u> exposing the scandalous truth. . . . [Cutler] uses her '<u>real life experience</u>. . . for a sexy, <u>semi-autographical</u> novel that is <u>sure to initiate a . . . game of Who's Who</u>.'" Hyperion/Disney specifically advertised the book as being in "a witty, <u>unapologetic</u> voice, the novel's narrator . . . <u>tells the story of . . . the staff counsel</u> <u>[i.e., Plaintiff] whose taste[s] . . . she 'accidentally' leaks to the office.</u>" Defendant should have known this from, *inter alia,* Cutler's and the book's publisher's widely publicized statements and the D.C. Action.

45. Defendant did read or should have read the advertisment, particularly given the prior litigation resulting from the blog.

46. Defendant participated in the advertising of the book.

47. Defendant participated in creating the advertisements for the book.

48. As the advertisement for the book makes clear through its use of quotations around the word "accidentally," Cutler intentionally disclosed plaintiff's private information. Defendant knew or should have known this and should have been on guard that the book was tortious.

49. Defendant and the publisher intentionally used this information to use plaintiff's likeness to advertise the book prior to the book's distribution. Defendant knew or should have known this.

50. Defendant was actively involved in the marketing and advertising of the book.

51. Defendant used plaintiff's likeness to advertise the book in violation of his rights of publicity and personality and misappropriating his likeness.

52. Defendant and others advertised the book as:

> [a] *sharp*, steamy, utterly unrepentant roman à clef exposing the scandalous truth of what goes on in the corridors of power on Capitol Hill, *based on the author's actual weblog of the same name.* Washington, D.C., staffer Jessica Cutler created a sensation last year when, in an on-line weblog meant just for friends, she began chronicling her late-night affairs with Washington power brokers. But word about her dishy and humorous account of her relationships with six different men on Capitol Hill inevitably spread around town and became such a hot topic that it got her fired from her entry-level job in the office of Senator Mike DeWine (an Ohio Republican). Now, in *The Washingtonienne*, *Cutler's real-life experiences* in the capital become fodder for a sexy, *semi-autobiographical* novel that *is sure to initiate a new Washington parlor game of Who's Who.*

> ...to the staff counsel [i.e., Plaintiff], whose taste for spanking she "accidentally" leaks . . . [the] loosely fictionalized exploits serve up large portions of D.C. dish.[3]

> Defendant knew or should have known this.

---

[3] See Appendix (emphasis added).

53. Not only was the book advertised as true prior to its distribution, the advertisement itself invited readers to determine exactly who is depicted in the book and specifically used plaintiff's likeness. Defendant participated in this or knew or should have known this.

54. Not only was the book advertised as true, it invited readers to determine exactly who is depicted in the book and specifically identified Plaintiff. Defendant participated in this or knew or should have known this.

55. Plaintiff's likeness was used to advertise the book prior to the book's distribution. Defendant participated in this or knew or should have known this.

56. Plaintiff's likeness was used to advertise the book without plaintiff's permission. Defendant knew or should have known this.

57. The advertisement for the book admits that the book invades plaintiff's privacy by providing "loosely fictionalized exploits [that] serve up large portions of D.C. dish." Defendant knew or should have known this.

58. In *Faegre & Benson v. Purdy*, 367 F.Supp. 2d 1238 (D. Minn. 2005), the court held that misappropriation need not use plaintiff's actual name for liability to attach, "as long as a pseudonym clearly identifies the plaintiff, it is protected from misappropriation."

59. The advertising for the book, and the text of the book itself, took great pains to identify plaintiff in the book. Defendant participated in this or knew or should have known this. Indeed, "the use of pseudonyms would not have gotten [the author and publisher of a book] off the legal hook. [Because t]he details of the [plaintiffs'] lives recounted in the book would identify them unmistakably to

anyone who has known the [plaintiffs] well for a long time (members of their families, for example), or who knew them before they got married; *and no more is required* for liability either in defamation law or in privacy law."[4]

60. The book advertisement misappropriated Plaintiff's likeness and violated his publicity and personality rights. Defendant participated in or knew or should have known this.

61. The book was distributed based on this advertisement. Defendant participated in this or knew or should have known this.

62. Both the advertisement for the book and Cutler's contract describe the book as a "roman a clef," which is defined as "[n]ovel that has the extraliterary interest of portraying identifiable people more or less **thinly disguised** as fictional characters."[5] Defendant participated in this or knew or should have known this.

63. Wikipedia describes as a notable example of a "roman a clef" as "*The Washingtonienne* (2005) <u>based on</u> the author Jessica Cutler's sexual affairs as a congressional intern with various men in Washington, D.C."[6] Defendant knew or should have known this.

64. *After* Plaintiff filed suit in the D.C. Action, the book's advertisement was reworded—specifically removing all previous references explicitly based on plaintiff and the previous explicit representations that the book is **not** fictional. These actions were done with such haste that the ensuing first paragraph is

---

[4] *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1233 (7th Cir. Ill. 1993) (emphasis added).

[5] http://encyclopedia2.thefreedictionary.com/roman+%C3%A0+clef (emphasis added).

[6] http://en.wikipedia.org/wiki/Roman_%C3%A0_clef.

unintelligible: "The blog that scandalized Washington, D.C., is *not* a sharp steamy, utterly unrepentant novel set against the backdrop of the nations' capital . . . [sic]."[7] Defendant participated in this or knew or should have known this.

65. The rewording took place *before* defendant distributed the book, putting defendant on even greater notice of the tortious nature of the book that it was soon to distribute and demonstrating defendant's knowledge of the tortious nature of the book.

66. The book simply replaced plaintiff's name with that of his deceased father. Defendant participated in this or knew or should have known this.

67. The Washington Post—in an article published *before* defendant distributed the Book—reported:

"Novel" is in quotation marks for the obvious reason: Apparently just about the only fictitious things in "The *Washingtonienne*" are the names. Everything else appears to be a literal account of Cutler's adventures, from her college years at Syracuse to her brief fling on the New York nightclub scene to her arrival in Washington, where she finagled a job on the Hill, merrily hopped from bed to bed and got what passes for a comeuppance in this city, where the only crime is getting caught and the rewards for hanky-panky are lavish: notoriety, airtime and a fat book contract.[8]

Defendant knew or should have known this.

68. Defendant was on notice by the advertisements and reviews of the book—*prior* to its distribution—that the book invaded plaintiff's privacy and otherwise violated his rights.

---

[7] See Appendix.

[8] http://www.washingtonpost.com/wp-dyn/content/article/2005/05/23/AR2005052301809.html.

69. Hachette knew or should have known and that the distribution of the book invaded plaintiff's privacy in various forms, defamed him, violated his publicity and personality rights, and intentionally inflicted emotional distress on him.

70. One court stated, "the use of pseudonyms would not have gotten Lemann and Knopf [the author and publisher of a book] off the legal hook. [Because t]he details of the [plaintiffs'] lives recounted in the book would identify them unmistakably to anyone who has known the [plaintiffs] well for a long time (members of their families, for example), or who knew them before they got married; *and no more is required* for liability either in *defamation law* or in *privacy law*."[9]   Defendant knew that the book invaded plaintiff's privacy and otherwise violated his rights and used his likeness for advertising.

71. Another court, in *Batra v. Wolf*, ruled:[10]

> This is a motion to dismiss a libel-in-fiction claim arising out of an episode of the television series Law & Order . . . . Famously evoking the phrase "ripped from the headlines," the show features stories and characters based upon current events. . . . Batra argues that because of the uniqueness of his name, ethnicity, and appearance, any person who knew him, or had heard of him, would identify him with [the "fictional" character] Patel. Moreover, because of the widespread media coverage of the Garson/Siminovsky scandal, with which the accusations against him [Batra] were inextricably intertwined, it would be reasonable for a viewer to associate Batra with [the "fictional" character] Patel. This Court agrees. . . . Defendants argue that no reasonable viewer could believe that [the TV show] stated actual facts about Batra. They deny that [the TV show] depicts actual events with respect to the Garson/Siminovsky scandal. Even if it did, the [the "fictional" character] Patel character refers to [another real person, *i.e.*,] Siminovsky. This Court disagrees. In the context in which [the TV show] was presented, extensive media coverage linking Batra to the Garson/Siminovsky scandal, there is a reasonable likelihood that

---

[9] *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1233 (7th Cir. Ill. 1993) (emphasis added).

[10] N.Y. Sup. Ct., No. 116059/04, 36 Med.L.Rptr. 1592 (3/18/08) (emphasis added), Exhibit __.

the ordinary viewer, unacquainted with Batra personally, could understand [the "fictional" character] Patel's corruption to be the truth about Batra. While the accusations against Batra were for graft rather than for bribery, it cannot be said that this distinction is sufficiently "far-fetched" that [the "fictional" character] Patel's corruption could never be understood as describing actual facts.[11]

The instant case is similar.

72. This case is similar to *People's Bank and Trust v. Globe International*, 978 F.2d 1065 (8th Cir. 1992), wherein a tabloid published a false story about an elderly woman who was pregnant. The representative of the 97-old woman whose photograph accompanied the story sued. The Eighth Circuit did not accept the newspaper's defense that the article was pure fiction. The Court found that the story, including its implication of sexual impropriety, was subject to reasonable belief. Like here, the paper held out the material as factual and true at times. The Court noted the mingling of fact and fiction by the defendant. The Court held liability because the newspaper recklessly failed to anticipate that the readers would believe that some or all of the story was true. Punitive damages were awarded. The court upheld the claim of invasion of privacy and outrage.

73. Defendant and others engaged in the ongoing acts of publication, commercialization, and/or distribution of the book the *Washingtonienne*. This book has the same title as, and tied to, the blog, "*Washingtonienne*." .

74. Hachette has not distributed anything from a "reputable news service."

75. Defendant knew or should have known of defendant's illegal prostitution and illegal drug use prior to distributing the book.

76. Arkansas has not adopted the "wire-service defense."

---

[11] *Id.*

77. Hachette *knew or had reason to know* of the existence of tortious, including libelous matter in the book.

78. Hachette *was* on notice *and* had actual knowledge of the tortious nature of the book. The D.C. Action, which Hachette *admits*[12] preceded its distribution of the book, *explicitly* put Hachette on notice of the tortious nature of the book, and, as such, Hachette "*knew or had reason to know* of the existence of [tortious, including] libelous matter in the Publication."[13] Hachette specifically so stated in its own brief: "plaintiff filed his D.C. lawsuit as a matter of public record on May 16, 2005, before the date of the alleged conduct [of the book's distribution by Hachette] giving rise to plaintiff's [current] claims [in the instant case], which, according to the complaint was 'Beginning on or about June 1, 2005"[14] And, "in his D.C. lawsuit, the plaintiff . . . [described] Jessica Cutler's Internet weblog [entitled the *Washingtonienne*] that he alleged invaded his privacy and caused him emotional distress."[15]

79. By Hachette's own admission, two weeks *prior* to Hachette's distribution of the book, Hachette *knew* that plaintiff had alleged that the blog that was admittedly the basis for the book invaded plaintiff's privacy and otherwise violated his rights.

---

[12] *See* Hachette's Motion to Dismiss at ¶¶ 16, 21 (D.C. case filed 5/16/2005 and Hachette's distribution of the book began two weeks later on 6/1/2005).

[13] Hachette's Brief in Support of this Motion to Dismiss at 4 (emphasis added).

[14] Hachette's Br. at 8.

[15] Hachette's Br. in Supp. Of MTD at 7.

80. *Triangle Publications, Inc. v. Chumley*,[16] demonstrates that Hachette is subject only to a negligence standard.

81. In *Triangle*, plaintiff brought a defamation case against a newspaper that *distributed* an advertisement in the newspaper.[17] The newspaper *did not create* in any way the advertisement.[18] The advertisement was created by the advertiser—a local television channel advertising for a new TV show—not the newspaper distributing the material.[19] The advertisement depicted the plaintiff's picture under a *different* name, and suggested that she was pregnant.[20] The court held that the newspaper could be held liable for not properly screening the advertisements that it distributed but did not create.[21] Specifically, the court held "appellants argue that they were entitled to rely on an advertisement prepared and submitted by WXIA-TV, a duly licensed television station, and are not responsible for any factual errors or defamatory matter contained therein. We disagree."[22] Additionally, the court specifically held that the use of a different name for plaintiff in the advertisement did not insulate in any way the newspaper from liability for distributing the tortious advertisement created by a third party.[23]

---

[16] 253 Ga. 179, 317 S.E.2d 534 (1984); *see also Pettengill v. Booth Newspapers, Inc.*, 88 Mich.App. 587, 278 N.W.2d 682 (1979).

[17] *Id.*

[18] *Id.*

[19] *Id.* at 180.

[20] *Id.*

[21] *Id.* at 182.

[22] *Id.* at 183 (emphasis added).

[23] *Id.*

The court held that the standard of ordinary negligence applied.[24]   These facts are similar to the instant case.

82. The book was written *prior* to the filing of the D.C. Action and, as such, never could have made reference to the litigation that had not taken place at the time that the book was completed.

83. No defense of public interest based on litigation could be based on a litigation that took place *after* the book was written.

84. Plaintiff's exercise of his Constitutional right to petition does not waive his ability to do the same in the future for separate tortious acts.

85. The book contains plaintiff's private facts never previously publicized, which invaded Plaintiff's privacy-constitute a violation of plaintiff's publicity and personality rights, and inflicted extreme emotional distress.

86. Defendant's actions were outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community and would shock the conscience of any reasonable person.

87. The book places plaintiff in false light.

88. The book defames plaintiff.

89. The book makes statements about plaintiff that are false, defamatory, and harmful.

90. These facts are of no legitimate concern of public interest.

91. The facts revealed are highly offensive, causing shocking degradation and egregious humiliation.

---

[24] *Id*. at 181. *See* SACK, Defamation, § 7.3.1 (discussing Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)).

92. The book says about plaintiff that he is: "a senior aide in my office."

Defendant knew or should have known this.

93. The book says about plaintiff: *"Too bad he's gay."*

Defendant knew or should have known this. The statement is false. The attribution constitutes defamation *per se,* places him in false light, intentionally inflicts emotional distress, and constitutes the tort of outrage. Defendant knew or should have known this.

94. The book says about plaintiff: "I don't know. There's just something strange about him. Maybe he's bi[sexual]." Defendant knew or should have known this. The statement is false. The attribution constitutes defamation *per se,* places him in false light, intentionally inflicts emotional distress, and constitutes the tort of outrage. Defendant knew or should have known this.

95. The book says about plaintiff that: "He didn't try to force himself inside my apartment like every other guy I had ever dated, nor did he ask if he could come in to use my bathroom." Defendant knew or should have known this.

96. The book says about plaintiff that: "He seemed nervous, and I still wasn't convinced that he wasn't homosexual. I pounced on him, straddling his lap area." Defendant knew or should have known this. The attribution constitutes defamation *per se,* places him in false light, intentionally inflicts emotional distress, and constitutes the tort of outrage.

97. The book says about plaintiff: "This wasn't your usual boring office f**k. This was far more intimate than regular sex: This was like *blackmail material*, and I loved it." Defendant knew or should have known this. This material invades

plaintiff's privacy, discloses his private facts, intrudes on his seclusion, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

98. The book says about plaintiff that he was "horny." Defendant knew or should have known this. The attribution constitutes defamation *per se,* places him in false light, intentionally inflicts emotional distress, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

99. The book says about plaintiff that he was "horny." Defendant knew or should have known this. The attribution invades plaintiff's privacy, discloses his private facts, intrudes on his seclusion, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

100. The book says about plaintiff that he was "spanking" Cutler "superhard." Plaintiff engaged in such behavior at Cutler's request and did not do so "superhard." Thus, this material both discloses plaintiff's private facts and intrudes on his seclusion, on the one hand, and is defamatory, places him in false light, and intentionally inflicts emotional distress, on the other. This material is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person. Defendant knew or should have known this.

101. The book says: "Do not talk about your sex life at work. (Unless you want to become extremely popular.) *Writing* about my sex life was much more fun

18

anyway, especially now that I had a new character—I mean, *person*—to write about in my blog." The new person was plaintiff. Defendant knew or should have known this.

102.     The book says about plaintiff that "I'm not sure if [he] makes enough money for me. I mean, he works *here*, after all. No offense." Defendant knew or should have known this.

103.     The book says about plaintiff that: "Did he like anal? 'Not really,' he said. 'It's sort of unsanitary.'" "'Please,' I said, looking over my shoulder at him, 'f\*\*k my ass.' Instead, he rolled me over and kissed me on the forehead. I looked at him incredulously. 'Take it easy,' he said, putting his arm around me. 'There's nothing wrong. I just prefer regular.'" Defendant knew or should have known this. This material invades plaintiff's privacy, discloses his private facts, intrudes on his seclusion, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

104.     The book says about plaintiff that: "That was one big difference between [Cutler] and [plaintiff]: He wanted to believe that I was a good person, and I wanted to believe that he was just another a\*\*hole who wanted to f\*\*k me over." Defendant knew or should have known this.     The attribution constitutes defamation *per se,* places him in false light, intentionally inflicts emotional distress, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

19

105.    The book says: "By then, [Cutler] was already in Washington, back in bed with" plaintiff. Defendant knew or should have known this. This material invades plaintiff's privacy, discloses his private facts, intrudes on his seclusion, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

106.    The book says that Cutler told plaintiff: "'I do *not* have a blog!' I insisted. 'If I had one, I would tell you about it, wouldn't I? It's not as if I have anything interesting to write about anyway.' I was such a f**king liar. But [plaintiff] bought it." How true. Defendant knew or should have known this.

107.    The book says about plaintiff that he "was probably the unluckiest guy in the world. I [Cutler] was a vain, arrogant, selfish girl who lied and cheated her way through life—a train wreck of a person." How true. Defendant knew or should have known this.

108.    The book says about plaintiff: "when it comes to his personal life," he "is very discrete." Defendant knew or should have known this. This demonstrates that plaintiff did not waive his rights and that defendant knew or should have known this.

109.    The book says about plaintiff: "We started sleeping together every night after that." Defendant knew or should have known this. This material invades plaintiff's privacy, discloses his private facts, intrudes on his seclusion, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

110. The book says about plaintiff: "He was probably reading my blog right now, feeling as if he'd been duped. Surely, everyone I knew felt that way about me, because I really was a liar and a whore, and now I was exposed." Defendant knew or should have known this. This demonstrates willful and malicious intention.

111.     The book says about plaintiff that he "was in Alcoholics Anonymous." The attribution constitutes defamation *per se*, places him in false light, intentionally inflicts emotional distress, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person. Defendant knew or should have known this.

112. Plaintiff was never in Alcoholics Anonymous. The attribution constitutes defamation *per se*, places him in false light, intentionally inflicts emotional distress, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person. Defendant knew or should have known this.

113. Plaintiff is not an alcoholic, recovering or otherwise. The attribution constitutes defamation *per se*, places him in false light, intentionally inflicts emotional distress, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person. Defendant knew or should have known this.

114.     The book says about plaintiff that Cutler "began wailing on him mercilessly until he begged [her] to stop." Defendant knew or should have known this. This material invades plaintiff's privacy, discloses his private facts, intrudes

on his seclusion, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

115.    The book says about plaintiff's genitalia: "it really depended on the size of their penis." And "He was big enough." This is the archetype of private information that anyone would find outrageous to be disclosed publicly. This material invades plaintiff's privacy, discloses his private facts, intrudes on his seclusion, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person. Defendant knew or should have known this.

116.    The book says about plaintiff: "We started sleeping together every night after that." Defendant knew or should have known this. This material invades plaintiff's privacy, discloses his private facts, intrudes on his seclusion, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

117.  About another one of her paramours, Cutler said in the book "A millionaire with a huge dick wanted to take me to my favorite city, fuck my brains out, and buy me expensive gifts." Defendant knew or should have known this. This book has no redeeming social purpose and is not newsworthy. To claim otherwise is sheer folly.

118.  Cutler admits in the book that she saw the book as "the chance to use my newfound fame to become independently wealthy." Defendant knew or should have known this. This admission demonstrates willful and malicious behavior.

22

119. Cutler admits in the book: "My attitude up until this point was, 'Why *not* feed into it?' I didn't care if people knew my shit anymore, but I realized that it wasn't just *my* shit that people were interested in. Degrading myself was one thing—if a woman did it to herself, she was in control. But I was humiliating a bunch of other people along with me, in effect, *victimizing* them." Defendant knew or should have known this. Defendant conspired to violate plaintiff's rights. This constitutes an admission that the book invades plaintiff's privacy, discloses his private facts, intrudes on his seclusion, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

120. The book says plaintiff said "'The latest rumor is that you and your friends planned this whole thing. Is it true?' 'It was beyond my control,' was all I [Cutler] could say, like that John Malkovich character from *Dangerous Liaisons.*" This constitutes an admission that the book invades plaintiff's privacy, discloses his private facts, intrudes on his seclusion, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person and that the book contains defamation *per se,* places him in false light, intentionally inflicts emotional distress, and is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person. Defendant knew or should have known this.

121. The book says plaintiff requested Cutler not to continue to be "pursuing any book or movie deals." And Cutler says in the book that she said "Why shouldn't I

23

make money?" Defendant knew or should have known this. This constitutes an admission that the book invades plaintiff's privacy, discloses his private facts, intrudes on his seclusion, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person and that the book contains defamation *per se,* places him in false light, intentionally inflicts emotional distress, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person. Defendant knew or should have known this.

122. The book says about plaintiff that "he was in *recovery*" for alcohol abuse. The attribution constitutes defamation *per se,* places him in false light, intentionally inflicts emotional distress, and is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person. Defendant knew or should have known this.

123. The book says that plaintiff had sex with Cutler *after* her prostitution and other bad acts were revealed to him and everyone else. The attribution constitutes defamation *per se,* places him in false light, intentionally inflicts emotional distress, is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person. Defendant knew or should have known this. It is one thing unwittingly to have a relationship with a surreptitious prostitute whose activities were unknown to plaintiff, it is wholly another to be involved with her after her illegal and immoral activities were revealed.

124. The book says about plaintiff: "He gave me a look that resembled pity. 'Get some sleep, J[essica]. Call me when you're feeling better." I got out of the car and watched him drive away, kicking myself for being such a slutted-out pill-head. That's what I was, wasn't I? No wonder he didn't want to come in." How true. Defendant knew or should have known this.

125. Defendant knew or should have known of the contents of the book.

126. The book's defamatory comments caused plaintiff actual harm.

127. The book's defamatory comments caused plaintiff professional harm in the advancement of his career and in obtaining professional opportunities.

128. The book's defamatory comments caused plaintiff professional harm by harming his professional reputation in the eyes of professional colleagues.

129. The book's defamatory comments caused plaintiff professional harm by harming his reputation in the eyes of students.

130. The book's defamatory comments caused plaintiff professional harm by harming his reputation in the eyes of his community.

131. Plaintiff is aware that the book's defamatory comments caused plaintiff harm by harming his reputation.

132. Defendant knew or should have known that Cutler's blog violated plaintiff's rights, that plaintiff sued to enforce those rights before the distribution of the book, and that the book was based on the blog.

133. Defendant knew or should have known that the book that was required to be based on the blog, and would therefore also be tortious to plaintiff.

134. In *Pulla v. Amoco Oil Co.*, 72 F.3d 648 (8th Cir. 1995), the Eighth Circuit upheld an invasion of privacy claim based upon a co-workers mere check of plaintiff's credit card records. Given that those facts meet the standard for invasion of privacy, the much more egregious facts here state a cause for invasion of privacy and other torts.

135. In *Elgin v. St. Louis Coca-a-Cola*, 2005 WL 3050633 (E.D. Mo. 2005), the court held that an employer's use of a GPS device to track an employee constituted an actionable intrusion. Given that those facts meet the standard for invasion of privacy, the more egregious facts here state a cause for invasion of privacy and other torts.

136. The blog was a few pages long. The book is a few hundred pages long. The book contains tortious information not found in the blog. Defendant knew or should have known this.

137. Hyperion paid Cutler $235,000 as an advance to expand her tortious actions from the blog and create the book.[25] Hachette was aware of this or should have been aware of this.

138. It is hornbook law that defamation and false light are always actionable, regardless of prior publication, because the statements are always false and defamatory.[26]

139. It is axiomatic that a plaintiff may bring a lawsuit for false light and defamation without granting license for others to make the same false accusations.

---

[25] *Id.*

[26] *See, e.g., Hellar v. Bianco*, 111 Cal.App.2d 424, 244 P.2d 757 (1952) (republication of defamation equally actionable).

Otherwise, if a person sued a defendant for, say, calling him an alcoholic, then anyone else could publicly accuse the plaintiff of being an alcoholic with impunity. Indeed, false light and defamation law are designed to do exactly the opposite.[27]

140. The District Court in the D.C. Action has already ruled that there is no legitimate public interest in the information about plaintiff's sex life and the information is not "newsworthy." Transcript of Motions Hearing Before the Honorable Paul L. Friedman United States District Judge, Wednesday, April 5, 2006, Page 52 line 22 to Page 54 line 9 ("**The argument that the defendant makes that there is a public interest in this kind of information I just reject. . . . The argument that the blog was newsworthy . . . I just don't think carries the day here.**").[28] Defendant knew or should have known this.

141. The Honorable Paul L. Friedman, United States District Judge, ruled: "The argument that the defendant makes that there is a public interest in this kind of information I just reject. . . . The argument that the blog was newsworthy . . . I just don't think carries the day here. . . . **Mr. Steinbuch's not a public figure.** So, I just reject the notion that the relationship between the two of them was a matter of public concern or interest, particularly the details the sex act they performed is just -- just doesn't carry the day at all. That's not a basis to

---

[27] *See id.*

[28] See Appendix.

27

dismiss.").[29] Transcript in DC Action, Wednesday, April 5, 2006, Page 52 line 22 to Page 54 line 9-14. Defendant knew or should have known this.

142. The District Court for the District of Columbia made this holding **after** the book was published and distributed. Thus the holding—that "**Mr. Steinbuch's not a public figure.** So, I just reject the notion that the relationship between the two of them was a matter of public concern or interest, particularly the details the sex act they performed is just -- just doesn't carry the day at all. That's not a basis to dismiss."—applies here.

143. Plaintiff's status as a private figure did not change.

144. Plaintiff's status as a private figure must be measured at the time the book was written.

145. As a matter of law, as determined by United States District Court, plaintiff is not a public figure.

146. As a matter of law, as determined by United States District Court, the book, which is based on the blog, is not a matter of public concern or interest.

147. The book, which adds more private information—and defamatory material—to the blog is equally unprotected.

148. Strict liability exists for defamation when the plaintiff is a private person and the issue under discussion is not one of public concern. *See* Rodney Smolla, Law of Defamation § 3.02[5].

149. The book is indisputably an expansion of the blog—indeed, employing exactly the same title, the *Washingtonienne*.

---

[29] See Appendix.

28

150. Plaintiff is under no obligation to prove malice.[30]

151. Defendant acted with malice when it knew or should have known, prior to distribution, of the tortious information that it subsequently distributed.

152. The book was in the planning for some time.

153. The Counsel for the U.S. Senate has disclosed that Cutler had on her Senate Computer a document with the same title, the *Washingtonienne,* again detailing sexual matters, that was dated a year BEFORE the blog was created and two years BEFORE the book was released.

154. Hachette—as well as the Disney Company, Hyperion—should not be surprised that they are being called to task for distributing the tortious material of a person already known to them to be a prostitute, an illegal drug user, and liar.

155. As one court stated in determining newsworthiness:

> While . . . the general criteria for determining newsworthiness are (a) the social value of the facts published; (b) the depth of the article's intrusion into ostensibly private affairs; and (c) the extent to which the individual voluntarily acceded to a position of public notoriety, the cases and authorities further explain that the paramount test of newsworthiness is whether the matter is of legitimate public interest which in turn must be determined according to the community mores. . . . *The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake*, with which a reasonable member of the public, with decent standards, would say that he had no concern.[31]

156. Cutler herself has consistently maintained that her disclosures of her numerous sexual encounters are *not* of legitimate public interest. Defendant knew or should have known this.

---

[30] *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985).

[31] *Sipple v. Chronicle Publishing Co.*, 154 Cal. App. 3d 1040, 1048-49 (italics in original, underline added, citation omitted).

157. Cutler said "I just think it's so silly. <u>The blog is really about a bunch of nobodies f\*\*\*ing each other.</u> I still can't believe people care."[32]  Defendant knew or should have known this.

158. Cutler told *Playboy* (for whom she unsurprisingly posed in sexually explicit pictures): "I wasn't doing anything that extraordinary . . . . None of these people [identified in the X-rated blog] were elected officials, so they don't deserve the scrutiny. . . .  [Otherwise,] I would have tried to cash in on that earlier."[33]  Defendant knew or should have known this.

159. It remains hornbook law that "[s]exual relations, for example, are normally entirely private matters . . . . [Even regarding a] public figure, [t]here may be some intimate details of [,say, a motion picture actress'] life, such as sexual relations, which even the actress is entitled to keep to herself."[34]  As another court stated:

> We are aware the disclosure of sexual and other such intimate information about even the most public of figures is often not considered newsworthy because it usually has nothing to do with that person's public life, and thus may not be considered of any legitimate concern to the public. Likewise, where involuntary public figures are involved, information of a sexual or intimate nature usually is unrelated to the general topic legitimately within the public's interest.[35]

As yet another court stated regarding similar facts—but for a public figure, no less:

---

[32] http://www.wonkette.com/archives/washingtonienne-speaks-wonkette-exclusive-must-credit-wonkette-the-washingtonienne-interview-009693.php

[33] *Internal Affairs*, Playboy (online), September 8, 2004 (Exhibit 8).

[34] *Doe v. Mills*, 212 Mich. App. 73, 82 (Mich. Ct. App. 1995).

[35] *Sipple v. Chronicle Publishing Co.*, 154 Cal. App. 3d. at 1077.

IEG contends that the wide distribution of a different videotape, one depicting sexual relations between Lee and her husband Tommy Lee, negates any privacy interest that Lee might have in the [new] Tape depicting sexual relations with Michaels. <u>The facts depicted on the Tommy Lee tape, however, are different from the facts depicted on the Michaels Tape. Sexual relations are among the most personal and intimate of acts. The Court is not prepared to conclude that public exposure of one sexual encounter forever removes a person's privacy interest in all subsequent and previous sexual encounters.</u>

It is also clear that Michaels has a privacy interest in his sex life. While Michael's voluntary assumption of fame as a rock star throws open his private life to some extent, even people who voluntarily enter the public sphere retain a privacy interest in the most intimate details of their lives.[36]

160. Hachette "attempt[s] to blur"[37] the difference between the legitimate public interest in the *lawsuits* and the absolute lack of a legitimate public interest in plaintiff's private sexual matters.[38]

161. Nothing in the book involves any lawsuit, as the book was written before any relevant lawsuit.

162. The book was written before any lawsuit by plaintiff and accordingly makes no reference thereto. Any lawsuit, therefore, cannot be the basis for a claim of legitimate public interest.

163. The false statements about plaintiff in the book are outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person conduct. *See People's Bank and Trust v. Globe International*, 786 F. Supp. 791 (W.D. Ark. 1991), *aff'd*

---

[36] *Michaels v. Internet Ent. Group*, 5 F. Supp. 2d 823, 840 (C.D. Cal. 1998).

[37] *Id*. at 842.

[38] *Id*.

*and remanded for remittitur*, 978 F.2d 1065 (8th Cir. 1992) (identity of elderly woman as pregnant is outrageous, constituting intentional infliction of emotional distress).

164. By mixing false and defamatory material with the fact that plaintiff does not recreationally drink alcohol, the book makes such a defamatory statement even more harmful.

165. None of plaintiff's private facts in the *Washingtonienne* is of a legitimate public interest.

166. The *Washingtonienne* is not of a legitimate public interest.

167. The *Washingtonienne* contains no matters regarding plaintiff that are of a legitimate public interest.

168. Defendant at times claims that the book is entirely fiction. At other times defendant asserts that the book involves private matters that are of nonetheless of legitimate public interest. These positions are inconsistent.

169. Public interest is not a factor in invasion of privacy cases for private figures.

170. The book does not contain matters of public interest. As one court stated:

> Does it follow . . . that a journalist who wanted to write a book about contemporary sexual practices could include the intimate details of named living persons' sexual acts without the persons' consent? Not necessarily . . . . The core of the branch of privacy law with which we deal in this case is the protection of those intimate physical details the publicizing of which would be not merely embarrassing and painful but deeply shocking to the average person subjected to such exposure. The public has a legitimate interest in sexuality, but that interest may be outweighed in such a case by the injury to the sensibilities of the persons made use of by the author in such a way. At least the balance would be sufficiently close to preclude summary judgment for the author and publisher.[39]

---

[39] *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1234-1235 (7th Cir. 1993) (citations omitted).

As the Seventh Circuit held: "[t]he reader of a book about the black migration to the North would have no legitimate interest in the details of Luther Haynes's sex life."[40] Finally, "[i]f there is room for differing views whether a publication would be newsworthy the question is one to be determined by the jury and not the court."[41]

171. The *Washingtonienne*, has no redeeming social value whatsoever. The book makes no social, political, or moral commentary on Cutler's prostitution, drug use, abortion, relationships, employment, or any other activities.

172. When the book was sent within defendants' law firm to senior partner Phil Anderson, the cover of the book the *Washingtonienne* was intentionally covered with a post-it to obscure its offensive nature.

173. If Phil Anderson, as counsel for defendant, should not be exposed to this offensive "material," neither should anyone else.

174. Defendant placed plaintiff in a false light and defamed him through the ongoing acts of publication, commercialization, and/or distribution of the book the Washingtonienne, by making false, harmful, and defamatory assertions about him.

175. This Court has ruled that Arkansas is a Multiple-Publication Rule jurisdiction.

176. Cutler commented in the press that she feels sorry for those people that write blogs for years and never obtain a book deal. Defendant knew or should have known this.

---

[40] *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1232 (7th Cir. Ill. 1993).

[41] *Times-Mirror Co. v. Superior Court*, 198 Cal. App. 3d 1420, 1428-1429 (Cal. Ct. App. 1988) (court found that witness' name in murder case is not newsworthy).

177. In responding to what she has done with her new found wealth resulting from her lucrative book deal, Cutler says "I guess you can buy more drugs." Defendant knew or should have known this.

178. Home Box Office purchased from Cutler the rights to make the book into a TV series. Defendant knew or should have known this.

179. Defendant's actions of publication, commercialization, and/or distribution of the book, constitute an invasion of Plaintiff's privacy, satisfying the elements of the tort of publication of private facts. Defendant caused widespread publication and publicity of private intimate facts concerning plaintiff that had not been publicized in Cutler's blog or elsewhere in a manner that would be deemed is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person and highly offensive to an ordinary reasonable person of average sensibilities, subjecting plaintiff to severe emotional distress, humiliation, embarrassment, anguish, and physical pain.

180. These disclosures were not made for any purposes relating to the dissemination of news or material published in the public interest and of no legitimate public concern. These disclosures were cruel and malicious exposures of the most intimate details of plaintiff's private life to the public. Defendant knew or should have known this.

181. These disclosures of private facts would be highly offensive to any reasonable person. Defendant knew or should have known this.

182. The right to privacy "is not merely balancing the individual's privacy interest against the public's interest in disclosure. The public, as evidenced by the enactment of [a right to privacy] has an equally important interest in safeguarding the individual's right to keep private aspects of his life private. . . . <u>Privacy in [certain] matters is not only essential to the welfare of the individual, but also to the well-being of society</u>." *Bonome v. Kaysen*, 17 Mass. L. Rep. 695, No. 03-2767, 2004 Mass. Super. LEXIS 172 (Super. Ct. 2004) at \*9-\*10 (emphasis added).

183. In denying Cutler's numerous motions to dismiss, the District Court in the District of Columbia *rejected* the argument that Culter's decision to publish her blog trumped plaintiff's right of privacy.

184. The invasions of privacy have caused plaintiff to suffer severe emotional distress, humiliation, embarrassment, anguish, pain and suffering and have damaged him relative to his community.

185. Defendant was intimately involved in the commercialization, and/or distribution the book.

186. Defendant profited from and consented to the publisher's actions in the commercialization, and/or distribution the book.

187. Defendant conspired with the publisher and others in the commercialization, and/or distribution the book.

188. Defendant was aware or should have been aware of the controversy involving Cutler's blog, including the litigation, before it distributed the book.

189. Through defendant's actions of publication, commercialization, and/or

distribution the book, defendant misappropriated plaintiff's likeness and identity in the text of and acts of publication, commercialization, advertising and/or distribution of the book subject to this lawsuit. Defendant profited from this misappropriation without the consent of or compensation to plaintiff.

190. Defendant violated plaintiff's publicity and personality rights.

191. Through Defendant's actions of publication, commercialization, and/or distribution the book, defendant violated plaintiff's publicity rights through the text of and acts of publication, commercialization, and/or distribution of the book subject to this lawsuit. Defendant profited from this misappropriation without the consent of or compensation to plaintiff.

192. Through Defendant's actions of publication, commercialization, and/or distribution the book, defendant violated plaintiff's personality rights through the text of and acts of publication, commercialization, and/or distribution of the book subject to this lawsuit. Defendant profited from this misappropriation without the consent of or compensation to plaintiff.

193. These actions have caused Plaintiff to suffer severe emotional distress, humiliation, embarrassment, anguish, pain and suffering and have damaged him relative to his community.

194. Through Defendant's actions of publication, commercialization, and/or distribution the book, the Washingtonienne, defendant portrayed plaintiff falsely, disparagingly, and defamatorily, putting him in false light, causing him harm.

195. These actions have caused Plaintiff to suffer severe emotional distress, humiliation, embarrassment, anguish, pain and suffering and have damaged him

relative to his community.

196. Through Defendant's actions of publication, commercialization, and/or distribution the book, the Washingtonienne, defendant's actions intruded upon plaintiff's right to seclusion.

197. These actions have caused plaintiff to suffer severe emotional distress, humiliation, embarrassment, anguish, pain and suffering and have damaged him relative to his community.

198. Defendant defamed plaintiff.

199. Defendant conveyed false and harmful statements of fact and used defamatory language regarding plaintiff.

200. Some or all of the defamatory statements would fall under the conceptual category of *per se* defamation, demonstrating its extremely harmful and is outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

201. The tortious statements were reasonably calculated to cause plaintiff harm. Defendant knew this or should have known this.

202. These statements were made and/or repeated intentionally, negligently, and/or with actual malice and conscious indifference to plaintiff's rights and the consequences to plaintiff.

203. Defendant acted with actual malice.

204. These actions have caused plaintiff to suffer severe emotional distress, humiliation, embarrassment, anguish, pain and suffering and have damaged him relative to the community, *inter alia*, regarding his reputation, character, and/or

37

esteem. Plaintiff has suffered economic damages and losses and physical and mental distress. Plaintiff has suffered actual damages, which exceed the diversity jurisdiction limits.

205. Defendant's actions are outrageous as to be beyond all possible bounds of decency and intolerable in a civilized community, and would shock the conscience of any reasonable person.

206. Plaintiff suffered severe emotional distress.

207. Plaintiff suffered physical harm as a consequence of defendant's outrageous conduct.

208. Defendant acted intentionally.

209. Defendant was reckless.

210. Defendant intended to cause plaintiff to suffer damages.

211. Defendant's actions caused plaintiff to suffer damages.

212. Defendant's actions have caused plaintiff to suffer severe emotional distress, humiliation, embarrassment, anguish, pain and suffering and have damaged him relative to his community.

213. Defendant conspired with the publisher and author of the book to commit acts that violated plaintiff's rights.

214. Defendant's acts constitute negligent media publication.

215. Plaintiff is entitled to punitive damages in response to defendant's reckless, malicious, intentional, and wanton conduct.

216. Punitive damages should be awarded punitive damages sufficient to set an example to discourage such egregious behavior.

Wherefore plaintiff seeks compensatory and punitive damages in an amount in excess of $1,000,000, such other declaratory and injunctive relief as appropriate, all fees, costs and disbursements, and any and all other relief to which plaintiff is entitled in law and/or equity.

Dated: May 8, 2009

Robert Steinbuch
6834 Cantrell Rd., # 222
Little Rock, AR 72207
(718) 673-4393
Plaintiff, Pro Se

# APPENDIX

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT STEINBUCH, .
.
     Plaintiff, .
.
. CA No. 05-0970 (PLF)
  v. .
. Washington, D.C.
JESSICA CUTLER, . *Wednesday, April 5, 2006*
. 2:05 p.m.
     Defendant. .
.
. . . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:     JONATHAN S. ROSEN, ESQ.
     1200 Gulf Boulevard
     Suite 1506
     Clearwater, Florida 33767
     908-759-1116

For the Defendant:     JOHN UMANA, ESQ.
     6641 32nd Street, NW
     Washington, D.C. 20015
     202-244-7961

Court Reporter:     BRYAN A. WAYNE, RPR, CRR
     *Official Court Reporter*
     U.S. Courthouse, Room 4808-B
     333 Constitution Avenue, NW
     Washington, D.C. 20001
     *202-216-0313*

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1    though other actions, linking the blog to Wonkette or otherwise,

2    that's clearly a fact question that we can't decide today.

3        The other thing that is a little bit complicated perhaps,

4    but I don't think I need to decide at this point, is the term

5    "publicity" in this tort, in this type of invasion of privacy

6    claim, the publication of a private matter, or the publicizing

7    of a private matter is different from publication as that term

8    is used in defamation, and that's made clear in the comment to

9    section 652D of the restatement.

10       So I think we need discovery on a lot of these things,

11   including specifically what role Ms. Cutler played in the

12   publicizing or the making public of these matters. I will say

13   this, that how many people have to be in the loop in order for

14   something to be made public may be certainly worth talking about

15   during discovery, but I do think the primary case on which the

16   plaintiff relies that publication, even to one or two people,

17   may be sufficient, McSurely v. McClellan, 753 Fed. 2d. 88, is

18   kind of a unique case that is not applicable across the board

19   and does not generally stand for the proposition that

20   publicizing it to one or two or three people is sufficient to

21   satisfy the elements of this tort.

22       The argument that the defendant makes that there is a

23   public interest in this kind of information I just reject.

24   Normally you balance the public's right to a certain kind of

25   information against the individual's right to privacy. It seems

1   to me that the public has no such right to this kind of

2   information about a person; that the individual's entitled to

3   maintain it privately, and there's no legitimate logical nexus

4   between the private facts allegedly disclosed here and the

5   matters of public interest that are invoked; namely, people are

6   interested in politics and in government, and everybody's

7   interested in relationships, whether they're financial

8   relationships or sexual relationships on Capitol Hill.

9       Financial relationships, maybe there is a strong public

10  interest in, and some of the things that have been in the press

11  recently about relationships between lobbyists and politicians

12  are of legitimate interest, and if somehow sex is involved in

13  that, maybe there is a public interest in it.

14      None of that is what's involved in this case.  It's just

15  a -- and I know that Mr. Umana did not write the brief, but the

16  argument -- I just want to make sure I have the right thing --

17  the argument that the blog was newsworthy "as a shocking and

18  disturbing portrayal of casual and even reckless sexual

19  encounters between young entry-level Capitol Hill staffers like

20  Cutler and more senior staffers like Steinbuch, more prominent

21  executive branch officials and older, married, powerful and

22  wealthy men is of interest to the public," and "the

23  interrelationship between youth, beauty, sex, money and power in

24  Washington has long been a matter of legitimate and sometimes

25  pressing public interest," I just don't think carries the day

1    here.

2         What's involved in this case is not the fact of a

3    relationship between two people, but the intimate details of

4    that relationship.  As I said before, facts surrounding sexual

5    intimacy are regarded as a classic example of private facts that

6    deserve protection, and comment B to the restatement says that,

7    that sexual relationships are normally entirely private matters.

8    Even public figures who do not have the same expectation of

9    privacy have an interest of privacy in those matters.

10        And Mr. Steinbuch's not a public figure.  So I just reject

11   the notion that the relationship between the two of them was a

12   matter of public concern or interest, particularly the details

13   of the sex act they performed is just -- just doesn't carry the

14   day at all.  That's not a basis to dismiss.

15        Intentional infliction of emotional distress -- I won't say

16   anything more about the other form of invasion of privacy that

17   is less explicitly alleged in paragraph 31 of the complaint,

18   which is publicity placing a person in a false light.

19        The restatement says one who gives publicity to a matter

20   concerning another that places the other before the public in a

21   false light is subject to liability to the other for invasion of

22   his privacy if A, the false light in which the other was placed

23   would be highly offensive to a reasonable person -- that kind of

24   parallels one of the elements of the other branch of this tort

25   we were just talking about -- and B, the actor had knowledge of

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

BRYAN A. WAYNE



Home
Browse for Books
New & Forthcoming
Our Authors
Reading Groups

About Hyperion
Contact Us

*Hyperion Select*
*Online Book Club*

*You're*
*Invited*
to read at the
Hyperion Select
Online Book Club

JOIN ▶



### The Washingtonienne:
### A Novel

by Jessica Cutler

 Reviews

 Excerpt

**A delightfully dishy satire about the sexy shenanigans of Washington's power elite, from a former Capitol Hill staffer.**

**A sharp, steamy, utterly unrepentant roman □lef exposing the scandalous truth of what goes on in the corridors of power on Capitol Hill, based on the author's actual weblog of the same name.**

Washington, D.C., staffer Jessica Cutler created a sensation last year when, in an on-line weblog meant just for friends, she began chronicling her late-night affairs with Washington power brokers. But word about her dishy and humorous account of her relationships with six different men on Capitol Hill inevitably spread around town and became such a hot topic that it got her fired from her entry-level job in the office of Senator Mike DeWine (an Ohio Republican). Now, in *The Washingtonienne*, Cutler's real-life experiences in the capital become fodder for a sexy, semi-autobiographical novel that is sure to initiate a new Washington parlor game of *Who's Who*.

In a witty, unapologetic voice, the novel's narrator Jackie tells the story of her failed engagement, her decision to move from New York to Washington, and the mischief she immediately starts getting into upon arrival. From the married, Bush-appointed bureaucrat who gives her $400 for a lunchtime tryst, to the staff counsel whose taste for spanking she "accidentally" leaks to the office, Jackie's loosely fictionalized exploits serve up large portions of D.C. dish and prove that Washington's taste for sexy extramarital relationships is by no means limited to the Oval Office.

Deliciously gossipy and impossible to put down, *The Washingtonienne* is destined to be *the* book in everyone's summer beach bag.

**Reviews**
"Forget the war in Iraq and the presidential election -- the real talk in the nation's capital is about the exploits of former senatorial staffer Jessica Cutler." --*In Touch*

hardcover: June 2005; $23.95US/$32.95CAN; 1401302009
Available at your favorite bookseller.

HYPERION Also available as a Hyperion audiobook.
AUDIOBOOKS

Top of Page

Home | Browse for Books | New & Forthcoming | Our Authors
Readers' Guides | For Booksellers | Press Room | About Hyperion | Contact Us

**Please click here for legal restrictions and terms
of use applicable to this site.**
Use of this site signifies your agreement to the terms of use.
**Please click here for Hyperion's Internet Privacy Policy.**

**?2000-2005 Hyperion. All rights reserved.**
Designed & maintained by FSB Associates





## The Washingtonienne: A Novel

by Jessica Cutler

 Reviews

Excerpt

The blog that scandalized Washington, D.C., is not a sharp steamy, utterly unrepentant novel set against the backdrop of the nations' capital . . .

*"Just between us girls, Washington is an easy place to get laid. It's a simple matter of economics: supply and demand. Washington lacks those industries that attract the Beautiful People, such as entertainment and fashion. Instead it has the government, also know as 'Hollywood for the Ugly.' Without the model-actress population to compete with, my stock shot up when I moved to DC."*

When Jacqueline Turner's fiancée gives her two days to move out of his apartment, she has no choice but to leave New York City and crash with her best friend in Washington, DC. (She can't be expected to keep herself in cute clothes while paying New York City rent, after all.) She needs a new, exciting life -- not to mention real employment. Where better to get a fresh start than the nation's capital?

Alas, DC turns out to be a lot more buttoned-up and toned down than she'd hoped. It's a town where a girl has to make her own excitement --

and Jacqueline Turner is just the woman for the job.

From the married presidential appointee who gives her cash after each tryst, to the lascivious Georgetown lawyer who parades her around like something out of *Pretty Woman*, Jackie's roster of paramours grows so complicated her friends ask her to start a blog so they can keep up. But in a small town like Washington, the line between private and public blurs very easily. Just as one of her beaux takes a lead in the race for her heart, Jackie realizes this blog idea may be more than she bargained for . . .

Deliciously gossipy and impossible to put down, *The Washingtonienne* is every bit as outrageously scandalous as the real-life exploits that inspired it.

### Reviews

"Forget the war in Iraq and the presidential election -- the real talk in the nation's capital is about the exploits of former senatorial staffer Jessica Cutler." --*In Touch*

---

hardcover: June 2005; $23.95US/$32.95CAN; 1401302009
Available at your favorite bookseller.

HYPERION AUDIOBOOKS Also available as a Hyperion audiobook.

---

Top of Page

**Please click here for legal restrictions and terms
of use applicable to this site.**
**Use of this site signifies your agreement to the terms of use.**
**Please click here for Hyperion's Internet Privacy Policy.**

©2000-2005 Hyperion. All rights reserved.
Designed & maintained by FSB Associates

Get New York Post Mobile

CLICK HERE
FOR THE
LATEST POST
SWEEPSTAKES

LogIn | Sign Up

CARS
JOBS
REAL ESTATE
DATING

NYC Weather
57° RAIN

**NEW YORK POST**
24 HOURS A DAY

Sunday, November 16, 2008
Last Update: 01:10 AM EST

Recent    GO

- home
- news
- sports
- gossip
- business
- entertainment
- opinion
- tv
- video
- photos
- blogs
  - Sports Blogs
  - PopWrap
  - PopTracks
  - Fashion
  - Movies
  - Travel
  - Real Estate
  - TV
  - Video Games
  - Tempo
  - Weight Loss
- classifieds
  - Post An Ad
  - Marketplace
  - Autos
  - Dating
  - Jobs
  - Real Estate

- News Home
- Columnists
- Politics
- Local
- National
- International
- Weird But True
- NYPD Blotter
- Transit
- Lottery


You've heard of Netflix...
Now try us for FREE!
Click here

# 'MADAM' LINK TO DC VIXEN

### PROBERS SEEK SENATE SCANDAL GAL

SHARE BOX
Show your support.
Buzz this article up.

Digg   Reddit   Park It   Facebook   Email
Link   Print

**By JEANE MacINTOSH and CHUCK BENNETT**

March 28, 2008

Rated Not yet rated
Rate This ☆☆☆☆☆

The former Senate aide who scandalously blogged about sleeping with Washington, DC's elite for cash - and later posed nude for Playboy - is among the inner circle of a Manhattan call-girl ring that counted Eliot Spitzer as a client, The Post has learned.

Four years after her blog "Washingtonienne" shocked the Capitol with salacious details of sex with married sugar daddies, Jessica Cutler has re-appeared as a "model" on alleged madam Kristin "Billie" Davis' Web site.



Jessica Cutler

◀ ⓘ ▶


You've heard of Netflix...
Click here

THE POST'S MOST....

Popular   Commented   Emailed   Viewed   Played



**PHOTOS: The Famous Jessica Cutler**

**PHOTOS: Hookers Made Famous by Eliot Spitzer**

**PHOTOS: UES Madam Kristin Davis**

The still-alluring Cutler is seen on Davis' MySpace page partying with the alleged madam at the birthday party for her booker, who sources said is a mutual friend of both women.

Davis captioned the photo "The Famous Jessica Cutler!" The same photo also appears on a Web site touting a shoot for Davis' business, Wicked Models.

But in that photo, Davis identified Cutler as "Brooke." The shot is one in a series of four, where she is dressed in lingerie and bikinis.

Cutler admitted it was her face on the Web site but said "they were Photoshopped."

Cutler wrote "The Washingtonienne: A Novel," and appeared nude on Playboy's Web site in 2004.

Asked yesterday if she worked as an escort, the temptress said: "I can't talk about that."

But in two days of conversations with The Post, she owned up to partying with Davis and even to living for a time in her posh apartment at 235 E. 40th St.

"They are going to want to see me for questioning," she said, referring to the Manhattan District Attorney's Office.

Cutler was being sought last night by the NYPD, along with other women connected to the ring, law-enforcement sources said.

Davis remained behind bars in lieu of $2 million bail.

Famous for referring to her men by their initials, Cutler's purported lovers included: "F," a Bush appointee and married man who paid her for sex; "W," a sugar daddy who preferred anal sex, and a man from her office who later said he was her lover.

Cutler says she first entered Wicked Models' orbit in 2006, when her roommate took a job as Davis' personal assistant.

According to Cutler, Davis boasted that disgraced former Governor Eliot Spitzer was a client. "She'd tell about how he used her agencies," she said.

Cutler said that last year she house-sat for the madam when she was in South America.

Cutler said Davis kept her black book, rumored to have 10,000 names, on desktop-computer software called Appointments Plus.

In an even more bizarre twist, Davis at one point planned to go into business with Benjamin Lovell, the Brooklyn man who last month was charged with theft after $5.8 million belonging to a man with the same name landed in his Commerce Bank account.

Sources familiar with both investigations confirmed that Lovell, 48, a married KeySpan Energy salesman, gave Davis $500,000 to buy a business.

Lovell told The Post he hooked up with Davis through a business associate - but that their deal fell through.

"I thought it was a dating service," Lovell said. "Thank goodness the deal didn't go through."

*Additional reporting by Kati Cornell*

*jeane.macintosh@nypost.com*

**Sponsored Links**

**ExxonMobil**
Taking on the world's toughest energy challenges.
www.media.exxonmobil.com

**The Most $100K+ Jobs**
Search 72,384 Jobs that pay over $100,000 at TheLadders.com.
www.TheLadders.com

**Bioidentical Hormone MDs**
Little Rock Physician Specializing in Natural Bioidentical Hormones.
www.BodyLogicMD.com

Buy a link here

FILMS THAT TURNED ON THE STARS

LET'S SEND IN THE CLOWNS

YANKS TRY TO BLOW AWAY CC WITH DEAL...

RAGING EGO

SCROOGED AT TIME INC.

ASHLEY UNVEILED

FAIL TO THE CHIEFS



See if you really know them...



Infiniti, QX56 2006 - $39500
Kings Plaza Chrysler Jeep
Read more...

Toyota, Land Cruiser 2008 - $72299
City World Toyota
Read more...

**Sponsored Links**

**ExxonMobil**
Taking on the world's toughest energy challenges.
www.media.exxonmobil.com

**Bioidentical Hormone MDs**
Little Rock Physician Specializing in Natural Bioidentical Hormones.
www.BodyLogicMD.com

**The Most $100K+ Jobs**
Search 72,384 Jobs that pay over $100,000 at TheLadders.com.
www.TheLadders.com

Buy a link here

SHARE BOX



Show your support.
Buzz this article up.

Digg · Reddit · Park It · Facebook · Email · Link · Print

**News**
- Local News
- National News
- International News
- News Columnists
- Weird But True
- NYPD Daily Blotter
- Liberty Medals
- Traffic & Transit
- Lottery
- Classroom Extra

**Sports**
- Yankees
- Mets
- Giants
- Jets
- Knicks
- Nets
- Rangers
- Islanders
- Devils
- Sports Blogs
- Columnists
- Bettor's Guide
- Horse Racing Picks
- Post Line

**Gossip**
- Page Six
- Cindy Adams
- Liz Smith
- Braden Keil
- Michael Riedel
- Celebrity Photos
- Celebrity Sightings
- Page Six Magazine
- Delonas Cartoons

**Business**
- Business Columnists
- Real Estate
- Stock Quotes

**Entertainment**
- Movies
- Movies Blog
- Oscars
- Food
- Fashion
- Fashion Blog
- Music
- Theater
- Health
- Travel
- Travel Blog
- Horoscope
- Weddings
- Dating
- Weekend Guide
- Comics & Games
- Post Game Report
- Tempo

**Post Opinion**
- Editorials
- Oped Columnists
- Letters
- Books
- Ramirez Cartoons
- Send a Letter

**TV**
- Linda Stasi
- Starr Report
- Adam Buckman
- Reviews
- TV Listings
- LIVE: The TV Blog

**Classifieds**
- Cars
- Dating
- Jobs
- Real Estate
- Marketplace
- Place an Ad

**Miscellaneous**
- Sweeps/Contests
- Coupons
- Media Kit
- Parade Magazine
- RSS
- Special Sections
- Privacy Policy
- Terms of Use
- Video
- Page Six Magazine Media Kit

**User Services**
- Contact Us
- FAQ
- Daily Newsletter
- Home Delivery
- Avant Go
- E-Edition
- Mobile
- Archives
- Back Issues
- Reprints
- Story Index
- Past Editions

SIGN IN     SUBSCRIBE     PRIVACY POLICY     TERMS OF USE     NEWS HEADLINES FROM OUR PARTNERS     RSS

NEW YORK POST is a registered trademark of NYP Holdings, Inc. NYPOST.COM, NYPOSTONLINE.COM, and NEWYORKPOST.COM are trademarks of NYP Holdings, Inc.
Copyright 2008 NYP Holdings, Inc. All rights reserved.

CERTIFICATE OF SERVICE

Plaintiff served the attached motion by causing it to be mailed via US mail on defendant on May 8, 2009 at:

Philip Anderson et al.
Williams & Anderson
111 Center St.
Little Rock, AR 72201

In addition, plaintiff's filing will result in defendant also receiving service through the ECF system.

Robert Steinbuch