# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**ROBERT STEINBUCH**                                                    **PLAINTIFF**

**v.**                                    **No. 4-08-CV-000456 JLH**

**HACHETTE BOOK GROUP**                                          **DEFENDANT**

## MEMORANDUM IN OPPOSITION TO MOTION TO AMEND

Defendant Hachette Book Group (hereinafter, "Hachette"), by and through undersigned counsel, respectfully submits this Memorandum in Opposition to the Motion to Amend filed by plaintiff Robert Steinbuch (hereinafter, "Steinbuch").

### PRELIMINARY STATEMENT

This is the fourth lawsuit against the seventh party brought by Steinbuch concerning writings of his former paramour, Jessica Cutler (hereinafter, "Cutler"). It is also the second time that Steinbuch has attempted to sue an additional party many years after he first learned of that party's involvement in the dissemination of Cutler's work. The last time Steinbuch tried this strategy, in the District of Columbia, the federal district court dismissed his amended complaint against the later-joined party as time-barred. The result here should be the same.

Steinbuch now proposes to file a forty-page Amended Complaint against a book distributor, alleging variations of the same causes of action he has asserted for the past four years in all of his lawsuits. In the Proposed Amended Complaint against Hachette, now the third lawsuit he has filed over Cutler's 2005 novel *The Washingtonienne* ("the book"), Steinbuch again claims that the book invaded his privacy, defamed him, and caused him emotional distress. If the Court were to grant leave to amend, Hachette would move to dismiss the Proposed

Amended Complaint on the merits on multiple grounds – some applicable to the complaint as a whole, others to each separate count, and some to particular allegations.[1]

For present purposes, however, Hachette believes there is a single threshold issue, not yet addressed by the parties or the Court, that would eliminate the need to expend substantial resources briefing the multiple legal issues that relate to the merits: specifically, whether the proposed claims are time-barred by the applicable statute of limitations. *See, e.g., United States ex rel. Joshi v. St. Luke's Hosp. Inc.*, 441 F.3d 552, 558 (8th Cir. 2006) (affirming denial of motion for leave to amend where claims in proposed amended complaint were untimely); *Paine v. Jefferson Nat'l Life Ins. Co.*, No. 2:07-CV-124 (JLH), 2008 WL 4809824, at *1, *10 (E.D. Ark. Oct. 28, 2008) (adopting magistrate's recommendation that motion to file amended complaint be denied as futile because proposed claim was time-barred).

Whether the Proposed Amended Complaint is time-barred is dependent upon which substantive law applies to this diversity action. Up to this juncture, there has been no need to consider the possible application of any law other than that of Arkansas because the issues raised in Hachette's motion to dismiss Steinbuch's original Complaint all involved generally accepted principles of tort law. In such circumstances, the law of the forum automatically applies.

---

[1] By way of just one example, Steinbuch alleges that the book defames him because it suggests the character of Marcus, whom Steinbuch alleges is based on him, is gay. Proposed Am. Compl. at ¶¶ 93-94 ("Too bad he's gay" and "maybe he's bisexual."). One of the many reasons these statements are not actionable is that they are obviously lifted out of context for purposes of making it appear that a cause of action might exist. These words are taken from sentences in the book in which the book's narrator, Jacqueline, humorously relates her mistaken impression before she met him that Marcus might be gay. Each of these passages is immediately followed by lines making the point that Jacqueline's earlier impression was wrong, such as: "[Y]es, Marcus is straight and he thinks you're hot" (Ex. 1 at 172); "Oh, he was straight" (Ex. 1 at 174); and "[H]e was a white heterosexual male, just like all the other guys in the office" (Ex. 1 at 188). Accordingly, the book is obviously incapable of conveying this allegedly defamatory meaning that Steinbuch attributes to it. (Exhibit 1, a full copy of the book, has been conventionally filed with the Clerk of the Court, pursuant to the Court's CM/ECF Administrative Policies and Procedures Manual for Civil Filings.)

*Phillips v. Marist Soc'y of Washington Province*, 80 F.3d 274, 276 (8th Cir. 1996) (in the absence of "true conflict" of laws, federal courts sitting in diversity will apply the substantive rules of decision of the forum state) (citation omitted).

The issue of timeliness raised now, however, does pose an actual conflict. Under Arkansas law, a three-year statute of limitations would apply to Steinbuch's claims here. But if the law of the District of Columbia governs this action, the Proposed Amended Complaint would plainly be time-barred by that jurisdiction's one-year statute of limitations. Applying Arkansas conflict-of-law rules – as this Court must in a diversity action – the law of the District of Columbia is the appropriate choice. Thus, the motion for leave to amend should be denied because it would be futile to proceed with litigation that is time-barred.[2]

---

[2] If the Court were to conclude otherwise and further exercise its discretion to grant leave to amend, Hachette would move to dismiss the Amended Complaint on the merits. The resolution of the choice-of-law issue presented here would have the added benefit of simplifying any litigation of the merits, since the applicable law would already have been determined. For the sake of completeness, we do note that Judge Wilson previously suggested that one other issue exists that might raise a potential conflict – whether Arkansas and D.C. might differ with respect to the "single publication" rule, whereby only one cause of action exists that accrues on the first general circulation date of a book or periodical. *Steinbuch v. Cutler*, No. 4:06-CV-620 (WRW), 2007 WL 486626, at *7 (E.D. Ark. Feb. 7, 2007), *aff'd in part*, 518 F.3d 580 (8th Cir. 2008). In fact there is no conflict, because both Arkansas and D.C. follow the same rule. The Arkansas Supreme Court held a century ago that no distinct defamation actions may be brought for subsequent republications of defamatory matter by the original publisher. *Murray v. Galbraith*, 86 Ark. 50, 109 S.W. 1011 (1908). *See also Ogden v. Ass'n of U.S. Army*, 177 F. Supp. 498 (D.D.C. 1959). Indeed, *Murray* was frequently cited by courts in other states as they too adopted the single publication rule. *See, e.g., Hartmann v. Time, Inc.*, 64 F. Supp. 671, 679 (E.D. Pa. 1946); *Winrod v. Time, Inc.*, 334 Ill. App. 59, 62, 78 N.E.2d 708, 710 (1948); *Foreman v. Miss. Publishers Corp.*, 14 So.2d 344, 348 (Miss. 1943). The issue that remains unsettled within Arkansas law is a different one – whether a new republication by someone else who had no relationship to the original publication can give rise to a new cause of action against the original publisher. *See, e.g, Luster v. Retail Credit Co.*, 575 F.2d 609, 613-14 (8th Cir. 1978); *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 729-30, 74 S.W.3d 634, 649-51 (2002).

## STATEMENT OF FACTS

A.     The Publication of Cutler's Weblog and Steinbuch's D.C. Lawsuit

As the Court is aware, this lawsuit is but the latest in a string of related lawsuits that began on May 16, 2005, when Steinbuch first sued Cutler in Washington, D.C.  *See* Ex. 2 (original D.C. complaint).  Hachette sets forth herein only those facts that are potentially relevant to the choice-of-law question.  To the extent any of these facts are not reflected in the Proposed Amended Complaint or the materials incorporated therein by reference (such as the book itself), they are matters of public record that the Court may judicially notice.  *See Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008).

All four of Steinbuch's current lawsuits allegedly relate, at least in part, to the May 18, 2004, publication by "Wonkette" – a Washington, D.C.-based weblog (or "blog") – of the contents of another blog maintained by Cutler.  Ex. 2 at ¶ 17.  At that time, both Steinbuch and Cutler worked on the staff of U.S. Senator Michael DeWine (R-Ohio) in Washington, D.C., where Cutler used computers to write her blog.  *Id.* at ¶¶ 2-3, 9.  Steinbuch then resided in Bethesda, Maryland (a very close suburb of Washington, D.C.).  *Id.* at ¶ 2.  Cutler was a Washington, D.C., resident.  *Id.* at ¶ 3.

On May 16, 2005, Steinbuch sued Cutler in federal court in the District of Columbia.  He attached Cutler's blog as a public exhibit to his complaint and quoted every reference to him in the blog in the complaint itself.  *See id.* at ¶ 30.  He alleged that the blog revealed private facts about him and intentionally caused him emotional distress.  Some months later, he clarified that he also was alleging that the blog invaded his privacy by placing him in a false light.  Ex. 3 at 9.

Steinbuch's alleged injuries were grounded on the allegation that the publication of Cutler's blog in May 2004 immediately led to widespread international dissemination of both the

4

blog itself and the republication of its contents in various media, identifying Steinbuch as the "RS" or "Rob" described in the blog. Ex. 2 at ¶ 19. Thus, according to Steinbuch, the blog's contents with respect to him were so well-known and publicly available that every prospective employer to whom he applied in 2004 and the first few months of 2005 asked him about it, well before the publication of the book that is the subject of this lawsuit. Ex. 4 at ¶ 14 (affidavit filed by Steinbuch in D.C. litigation). Steinbuch's D.C. complaint also complained that Cutler had signed a book contract with Hyperion Books to write a book supposedly based on the blog, and quoted the same website description of the book that he now attaches to the Proposed Amended Complaint here. Compare Ex. 2 at ¶ 27 with Proposed Am. Compl. at ¶ 52.

The filing of Steinbuch's D.C. lawsuit sparked even more widespread international publicity. Indeed, numerous mainstream news organizations that, up to that point, had never identified Steinbuch by name in connection with the blog controversy immediately did so.[3]

B.    Steinbuch Moves to Arkansas and Expands the D.C. Litigation

On or close to June 2005, Hyperion published *The Washingtonienne*, the book that is the subject of this lawsuit. As this Court has already found, sometime after the publication of the book, Steinbuch moved from the Washington, D.C., area. *Steinbuch v. Cutler*, No. 4:06-CV-620 (WRW), 2007 WL 486626, at *7 (E.D. Ark. Feb. 7, 2007) ("*Steinbuch I*"), *aff'd in part*, 518 F.3d 580 (8th Cir. 2008). However, he continued to litigate and expand his case in the District of Columbia. Indeed, after the book was published, Steinbuch made additional allegations in the D.C. case concerning the book, similar to allegations he now makes here. He maintained that

---

[3] In fact, though it is immaterial for purposes of this motion, it is noteworthy that, until Steinbuch sued Cutler, any publicity identifying Steinbuch seems to have largely been confined to gossipy discussion on other blogs or Internet message boards. Once Steinbuch filed the D.C. lawsuit, however, publicity increased exponentially. A search of NEXIS reveals 137 print and broadcast reports containing the name "Robert Steinbuch." The first such report appeared on May 17, 2005, the day after Steinbuch filed his D.C. lawsuit.

"Cutler furthered the false and offensive impression of Plaintiff in the book [by] falsely suggesting, *inter alia*, that Steinbuch was an alcoholic . . . . All of this clearly constitutes false light." Ex. 3 at 12-13. He also complained that the book invaded his privacy and that advertising for the book, the same material attached here, misused his identity. *Id*. at 21, 29.

One of the threshold issues raised in the D.C. case was whether the applicable statute of limitations was one year or three years with respect to some or all of Steinbuch's claims in that case. Though he had already moved to Arkansas by that point, Steinbuch maintained that either the law of the District of Columbia or Maryland applied to all of his claims in that litigation. He later stipulated that D.C. law applied because he concluded there was no material difference between the two. *Id*. at 32 n.31. The court (Friedman, J.) denied Cutler's motion to dismiss, but in so doing ruled that D.C. law applies a one-year statute of limitations to all claims for invasion of privacy and intentional infliction of emotional distress arising out of the same allegedly tortious statements, just as it does for defamation claims. Ex. 5 at 58-59.

C.    Steinbuch Sues Cutler and the Publisher of the Book in this Court

About six weeks after Judge Friedman ruled that the D.C. statute of limitations is one year, Steinbuch filed his second lawsuit, this time against Cutler, Hyperion Books, and several other defendants. Steinbuch seems to suggest that he had actually intended to pursue claims against the book in the D.C. action, but instead filed a separate suit over the book in Arkansas only because he wanted to avoid further skirmishing over what exactly the scope of the claims pled in D.C. were supposed to be. Ex. 6 at 1. ("During this [D.C.] action, each and every time Plaintiff raised the issue of the tortious book that Cutler wrote and Hyperion/Disney published, Cutler objected – stating that this case did not involve her [allegedly] privacy-invading book."). Steinbuch's second lawsuit was filed in this Court on May 30, 2006 – exactly two days prior to

the one-year anniversary of what Steinbuch understood to be the formal publication of the book. *See Steinbuch I*, Dkt. No. 1.

All Defendants moved to dismiss the complaint for lack of personal jurisdiction on August 18, 2006. Hyperion filed its distribution agreement with Hachette as an exhibit supporting that motion. As the Court is aware, both this Court and the Eighth Circuit agreed that this Court lacked specific jurisdiction over the case, in large part because the action has little connection to Arkansas. However, the Eighth Circuit further found that, while Steinbuch had also not set forth a prima facie case for general jurisdiction over Hyperion, he should be permitted a further opportunity to take jurisdictional discovery. It remanded the case for that purpose. *Steinbuch v. Cutler*, 518 F.3d 580, 587 (8th Cir. 2008) ("*Steinbuch II*"), *cert. denied*, 129 S.Ct. 223 (2008).

D.      Steinbuch Unsuccessfully Sues a D.C. Blogger

While he was litigating the Hyperion case in this Court, Steinbuch also filed an amended complaint in his first lawsuit, the D.C. case. The purpose of that amendment was in part to add a new defendant, Ana Marie Cox, the "Wonkette" blogger who had exposed Cutler's blog to the world. Ex. 7 at ¶ 6. Though Steinbuch had been living in Arkansas for almost a year by that point, he continued to accept that D.C. law, including the applicable statute of limitations, would apply to the case. Ex. 8 at 11. On May 16, 2007, the D.C. Court granted Cox's motion to dismiss on the grounds that all the claims against her were time-barred by the one-year D.C. statute of limitations, since she was sued more than two years after the publication of Cutler's blog. The D.C. court held that the claims against Cox did not "relate back' to the filing of Steinbuch's original complaint against Cutler, in part because Steinbuch was always aware of Cox's potential relationship to the case. Ex. 9 at 49.

E.      Steinbuch Sues Cutler in New York

Shortly thereafter, Cutler filed a petition for bankruptcy in the United States District Court for the Northern District of New York, which stayed all proceedings against her in the other cases. On September 4, 2007, Steinbuch filed his third lawsuit, an adversary proceeding against Cutler in that court. Ex. 10. His Complaint for Non-Dischargeability essentially joins the claims against Cutler in both the D.C. and Arkansas actions into one, alleging that the claims in both cases constitute "willful and malicious" conduct and therefore should be declared non-dischargeable. Though that lawsuit is technically only against Cutler, his complaint makes repeated allegations against Hyperion and the other "Arkansas Defendants." *Id.* at ¶¶ 29, 31-32. That lawsuit remains pending at the present time. After Cutler moved to dismiss, rather than ruling on the motion, the bankruptcy court gave Steinbuch twenty days to file an amended complaint, due on June 18, 2009. Ex. 11 at 27. The Court also sanctioned Steinbuch for discovery abuses and ordered him to pay Cutler's attorneys' fees and costs. *Id.* at 14, 18-21, 26-27.

F.      Steinbuch Sues Hachette in Arkansas

On May 30, 2008, Steinbuch brought this fourth lawsuit, this time against Hachette, the distributor of the novel. The Court granted Hachette's motion to dismiss without prejudice. Steinbuch then filed the instant motion for leave to file an amended complaint and attached a proposed forty-page Amended Complaint. In many respects, the proposed amendments take words that this Court found lacking in the original Complaint and repeat them numerous times, such as allegations to the effect that Hachette "knew or should have known" of the book's "tortious nature." *E.g.*, Proposed Am. Compl. at ¶¶ 15-16, 18-21, 23-26, 28-31, 38, 52, 53-57, 60-69, 75, 77-79, 92-125, 132-33, 136-37, 156-58, 176-81, 201. A core allegation that

permeates the Proposed Amended Complaint is that the book is allegedly a "thinly disguised" republication of the contents of the blog. *E.g.*, *id*. at ¶¶ 29, 30, 44, 52, 62, 149.[4] Indeed, many of the allegations made concerning both the content of the book and the book's advertising are similar to those Steinbuch had previously made about the book in the D.C. litigation. Moreover, dozens of paragraphs allege that it was the filing of the D.C. action that supposedly "put on notice defendant that the book is tortious before defendant distributed the book." *Id*. at ¶ 17.

## ARGUMENT

In general, federal courts liberally allow amendments to pleadings in civil actions. But where, as here, the plaintiff's complaint was previously dismissed and the proposed amended complaint is defective as a matter of law, leave to amend is frequently and properly denied on grounds of futility. *See Baptist Health v. Smith*, 477 F.3d 540, 544 (8th Cir. 2007) ("[I]n determining whether to permit an amendment . . . the district court has broad discretion . . . . [T]here is no absolute right to amend[,] and a court may deny the motion based upon a finding of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies in previous amendments, undue prejudice to the non-moving party, or futility.") (internal quotation marks and citations omitted); *Horvath v. Knight & Wilson, Inc.*, No. 4:06-CV-1376 (JLH), 2006 WL 3533145, at *2 (E.D. Ark. Dec. 6, 2006) ("Because it would be futile to permit [the plaintiff] to amend his complaint, the motion for leave to amend will be denied.").

In this case, as a threshold matter, the Proposed Amended Complaint would be futile because any claim that it purports to attempt to state would be entirely barred under the one-year statute of limitations of the District of Columbia, and Arkansas courts would apply D.C. law to

---

[4] While Hachette does not agree with this claim and numerous other allegations Steinbuch makes, the resolution of those issues is irrelevant to the question presented here.

those claims rather than the three-year Arkansas statute.  Accordingly, and as explained more

fully herein, Steinbuch's motion to amend should be denied.

## I.      ARKANSAS AND D.C. LAW CONFLICT WITH RESPECT TO THE APPLICABLE STATUTE OF LIMITATIONS

The threshold question in any case where more than one state's law might apply is

whether a potential conflict actually exists between the respective state laws.  *Phillips*, 80 F.3d at

276.  Here, the laws concerning the applicable statute of limitations do conflict.  D.C. law applies

a one-year statue of limitations to claims for defamation and each of the four branches of the tort

of invasion of privacy.  *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 10 (D.D.C. 2008) (one-

year statute applies to tort of misappropriation of name and likeness); *Rogers v. Johnson-*

*Norman*, 466 F. Supp. 2d 162, 174 n.10 (D.D.C. 2006) (one-year statute applies to any theory of

invasion of privacy); *Grunseth v. Marriott*, 872 F. Supp. 1069, 1074 (D.D.C. 1995) (one-year

statute of limitations applicable to libel and similar torts also applies to invasion of privacy

claims), *aff'd*, 79 F.3d 169 (D.C. Cir. 1996).  Moreover, the one-year statute also applies to any

claim for intentional infliction of emotional distress that arises out of the same allegedly

injurious publication.  *Foretich v. Glamour*, 741 F. Supp. 247, 251 (D.D.C. 1990); *Thomas v.*

*News World Commc'ns*, 681 F. Supp. 55, 72 (D.D.C. 1988).  Thus, D.C. applies a one-year

statute to every cause of action proposed here.  For this very reason, Judge Friedman in the D.C.

litigation dismissed as untimely Steinbuch's amended complaint there asserting claims for

invasion of privacy and intentional infliction of emotional distress against a blogger who

allegedly published Cutler's blog.  Ex. 9 at 49.[5]  Arkansas' statute of limitations, however, is

_____

[5] Because Plaintiff lived in Maryland while he worked in Washington, D.C., Maryland
law would also in theory be a potential candidate.  In the D.C. litigation, however, Steinbuch saw
no difference between Maryland and D.C. law, and therefore consented to the application of

three years for all of Steinbuch's claims.  *See* ARK. CODE ANN. § 16-56-105(5) (Michie 2009)

(three-year limitations period for libel claims); *Norris v. Bakker*, 320 Ark. 629, 631-32, 899

S.W.2d 70, 71 (1995) (three-year statute of limitations for invasion of privacy).  While it is

possible that discovery would ultimately reveal that some or all of Steinbuch's claims might be

time-barred even under Arkansas's statute, at least on its face the Proposed Amended Complaint

pleads some events that allegedly occurred within Arkansas's statute of limitations.  Thus, a

conflict exists, and it is necessary to address the choice-of-law question.

## II.    THE LAW OF THE DISTRICT OF COLUMBIA APPLIES

When Steinbuch moved to Arkansas in 2005, he brought with him a feud that had begun

more than a year earlier in the District of Columbia and had already erupted into litigation there.

By that time, Cutler's original blog had been publicized for more than a year, the book had

already been published, and Steinbuch had already repeatedly made allegations concerning the

book in the D.C. case.  The fortuity of Steinbuch's relocation to Arkansas did not give this state

any significant interest in the resolution of those disputes.

Indeed, the timing of Steinbuch's previous lawsuits make clear that he has always

understood that the D.C. statute of limitations may govern all of his disputes related to his brief

relationship with Ms. Cutler, including any lawsuits filed in Arkansas concerning the book.

When he first filed suit over the novel in this Court (his second lawsuit in total), he took care to

file that suit two days before what he understood to be the one-year anniversary of the formal

publication of the book.  If Steinbuch thought it was clear that Arkansas law would apply to

_____

D.C. law.  Ex. 3 at 32 n.31.  Moreover, in the circumstances of this case, for the reasons stated
herein, D.C. law is the proper choice in any event.

disputes over the book, there would be no reason to file precisely on that date. Steinbuch's strategic choice was well-founded, because the D.C. statute of limitations does apply.[6]

A.   Arkansas Substantive Choice of Law Rules Govern This Case

In a diversity case, a federal court applies the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386 (8th Cir. 1997). Arkansas choice of law rules require the Court to consider a combination of both the traditional *lex loci delicti* doctrine and five choice-influencing factors first articulated by Professor Leflar. *Lane v. Celadon Trucking, Inc.*, 543 F.3d 1005, 1010 (8th Cir. 2008); *Ganey v. Kawasaki Motors Corp., U.S.A.*, 366 Ark. 238, 234 S.W.3d 838 (2006).

Those factors are "(1) predictability of results, (2) maintenance of interstate and international order, (3) simplification of the judicial task, (4) advancement of the forum's governmental interests, and (5) application of the better rule of law." *Ganey*, 366 Ark. at 251, 234 S.W.3d at 846. Though historically statutes of limitation were considered "procedural" for choice of law purposes, and therefore governed by forum law, in *Ganey* the Arkansas Supreme Court clarified that these same substantive rules apply where the potential conflict involves statutes of limitation. *Id*. at 250-51, 234 S.W.3d at 846. *See also* 2 Ark. Prac. & Proc. § 6:4 ("the Arkansas Supreme Court has recently departed from this rigid view [that the statute of limitations is merely procedural] in favor of a more flexible choice of law analysis that can lead to application of foreign law").

---

[6] Because Steinbuch filed the Hyperion case in May 2006, a full two years before this case, the limitations conflict issue presented here would only arise in the Hyperion case if that case ever proceeded to discovery on the merits and such discovery ultimately revealed a potential statute of limitations defense under D.C. law in that case as well. Otherwise, the law of the forum would presumptively apply.

B.    The *Lex Loci Delicti* Test Favors D.C. Law

Applying these rules here, this Court must first consider the traditional *lex loci delicti* test.  The *loci delicti*, or "place of the wrong", is generally the place where "'the last event necessary to make an [actor] liable for an alleged tort takes place.'"  *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (citation omitted).  In defamation cases, the "place of the wrong" is the place where the allegedly defamatory statements were published.  RESTATEMENT (FIRST) OF CONFLICT OF LAWS § 377 (1934); *Patch v. Playboy Enterprises, Inc.*, 652 F.2d 754, 757 (8th Cir. 1991) (the law of the place of publication is the operative test under the *lex loci* rule).  That same rationale would apply to any other tort arising out of the same allegedly injurious publication.  *See, e.g.*, *Hatfill v. Foster*, 415 F. Supp. 2d 353, 364-69 (S.D.N.Y. 2006) (applying *lex loci* test to claims for defamation and intentional infliction of emotional distress).

As a result, under the *lex loci* rule "[t]he determination of which state's law applies is made in light of the facts that existed at the time of the tort – that is, publication of the articles." *Id*. at 364.  When a publication is simultaneously published in multiple states, as was the case here, there is no single "place of publication."  Therefore, courts applying the *lex loci* test in a multistate publication case usually apply the law of the plaintiff's domicile at the time of the publication, unless, as here, some other state at the time had a more significant relationship to the dispute.  *Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir. 1999); *Hatfill*, 415 F. Supp. 2d at 365; *Miller v. Lear Siegler, Inc.*, 525 F. Supp. 46, 56 (D. Kan. 1981).  *See also Lane*, 543 F.3d at 1010 ("Under Arkansas law, first we must decide which state has the most significant relationship to the parties and the issues.").

Thus, at the outset it is clear that, under the *lex loci* test, Arkansas law is not even a potential choice.  At the time the book was published, this Court has already found, Steinbuch

was not domiciled in Arkansas and this state had no relationship at all to this dispute. *Steinbuch I*, 2007 WL 486626, at *4. Indeed, Steinbuch's Proposed Amended Complaint makes it clear that at least some of his alleged injuries actually pre-date what he understands to be the date of the publication of the book, and thus arose at a point in time that was even farther removed from his move to Arkansas. The first Hyperion website catalog entry for *The Washingtonienne* that Steinbuch includes in the Appendix to his Proposed Amended Complaint – which relates to several of his allegations concerning alleged website descriptions of the book – is dated March 18, 2005, almost three months before the book was allegedly published. In fact, he even quoted that catalogue description in May 2005 in his D.C. complaint. Steinbuch's situation is thus analogous to the plaintiff in *Hatfill v. Foster*, who moved to Virginia after the publication of allegedly tortious newspaper articles and then filed suit in that state for defamation and intentional infliction of emotional distress. Applying Virginia's *lex loci* rule, the *Hatfill* court found that Virginia law could not apply in those circumstances and applied D.C. law instead.

Steinbuch's domicile at the time of the relevant publications was in a bedroom suburb a few miles across the D.C. border in Maryland, but several factors here point toward D.C. in any event. The book is entitled, after all, "The Washingtonienne," and it focuses on events that occurred in the District of Columbia. Indeed, this entire dispute arises out of an amorous relationship between Steinbuch and Cutler that was formed at their workplace in D.C. Even more important, the gravamen of Steinbuch's Proposed Amended Complaint is that the book is allegedly just a "thinly disguised" version of the blog, and Steinbuch has for years been litigating the issues raised by the blog in the District of Columbia under that jurisdiction's law. Indeed, Steinbuch has repeatedly made allegations concerning the book in the D.C. case, even after filing cases in Arkansas. It makes little sense to split the laws applicable to these intertwined cases into

two (or even three) states based solely on where they were filed, particularly given that Steinbuch previously stipulated to the application of D.C. law in the same circumstance, when the D.C. court was considering what statute of limitations applied to that case.

In short, two conclusions emerge from the application of the *lex loci* test. First, Arkansas law is not even a potential choice and, second, D.C. law is the most appropriate choice.

B.     Professor Leflar's Five Factors Also Favor D.C.

Consideration of the five "choice-influencing" Leflar factors yields the same conclusion. The Arkansas Supreme Court's decision in *Ganey* is particularly relevant here because that case arose on a motion to dismiss and also involved a choice between Arkansas' three-year statute of limitations and another state's one-year statute. In *Ganey* the accident at issue actually took place in Arkansas, but the Court found that all other factors pointed toward Louisiana. As a result, the Court applied Louisiana's one-year statute of limitations to dismiss claims for negligence and other related theories asserted in that case. Here, the facts present even less of a connection to Arkansas, since Steinbuch moved here after the publication of the book and well after his disputes with Cutler first arose. *See Ray v. American Airlines, Inc.*, No. 08-5025, 2009 WL 921124, at *3 (W.D. Ark. Apr. 2, 2009) (applying Texas law because, "[w]hile Plaintiff may reside in Arkansas, the allegations supporting Plaintiff's claims involve actions/inactions that occurred in Texas").

The first Leflar factor – predictability of results – implicates several issues, which on balance clearly point to D.C. One issue is whether "the remedy afforded under either state's [] law is similar." *Ganey*, 366 Ark. at 252, 234 S.W.3d at 847. This issue might favor no particular state because libel and privacy laws are generally similar, as was the case with the claims at issue in *Ganey*. However, other issues weigh particularly heavily where multiple lawsuits are filed

concerning related matters.  The Arkansas Supreme Court has explained that the primary "consideration [underlying Leflar's predictability factor] is the ideal that a decision following litigation on a given set of facts should be the same regardless of where the litigation occurs in order to prevent forum shopping." *Schubert v. Target Stores, Inc.*, 360 Ark. 404, 410, 201 S.W.3d 917, 922 (2005).

In this case, therefore, this factor clearly tilts towards D.C., because Steinbuch is trying to re-enact here the very strategy that was rejected in D.C.  Steinbuch attempted to sue in D.C. another party (Ana Marie Cox) allegedly involved in disseminating Cutler's blog, more than a year after he originally sued Cutler.  The claims against Cox were dismissed as time-barred. Here, he is again attempting several years later to file another suit against another party, this time over the book, which he alleges is merely an extension of the blog.  Permitting that strategy to succeed here under a different state's law would not facilitate "predictability of results."

The predictability prong of the analysis also takes account of the need for potential defendants to accurately assess the legal risk associated with particular activities and to plan accordingly.  For instance, in *Lane*, the Eighth Circuit, applying Arkansas conflict-of-law principles, found that predictable application of a state's worker's compensation subrogation scheme was "particularly important to . . . [a] self-insured company [that] has a nationwide network of truck drivers," and counseled in favor of applying the company's home-state law (Indiana) rather than the law of the place of the injury (Arkansas).  543 F.3d at 1011.

It is no less important for nationwide book publishers and distributors to be able to ascertain their potential exposure to defamation and invasion of privacy claims in a predictable manner.  In this case, it would be the antithesis of a predictable result to apply the law of Arkansas, a state to which Steinbuch did not move (and had no known connection) until after the

book was published, to claims arising from a book written by a D.C. author about events occurring in the District of Columbia and involving people who worked there and had no obvious connection to Arkansas. In fact, it is difficult to square Steinbuch's repeated allegation in the Proposed Amended Complaint that it was the filing of the D.C. lawsuit that supposedly gives him a basis to pursue this lawsuit against Hachette as the distributor of the book, with the conclusion that he is nonetheless free to ignore the D.C. statute of limitations to sue Hachette.

The second factor – maintenance of interstate order – often looks at which state "has a more significant relationship to the parties." *Ganey*, 366 Ark. at 252, 234 S.W.3d at 847. *See Lane*, 543 F.3d at 1011 ("When the forum state has little or no contact with a case and nearly all of the significant contacts are with another state, the second factor, maintenance of interstate and international order, suggests that the forum should not apply its own law to the dispute.").[7] Here the *only* jurisdiction that has any significant relationship is D.C. The book is entitled "The Washingtonienne," and it allegedly concerns events that were focused in and around D.C.

This litigation, moreover, is really an extension of other litigation in D.C. Indeed, this Court previously found in the Hyperion case that Arkansas lacked specific jurisdiction over the publisher in part because "[t]he events that inspired the book took place in Washington, D.C., and most of the alleged harm occurred there." *Steinbuch I*, 2007 WL 486626, at *7. And Judge Wilson explicitly noted that, "[b]y the time Steinbuch reached this state, the alleged invasion of privacy was complete. Thus, the injury to Steinbuch did not occur as a result of Defendants' activities in this state, nor was it the result of activity directed at Arkansas residents." *Id*. at *4. The Eighth Circuit agreed that "Steinbuch's cause of action appears to have no direct connection with the forum state or to have

---

[7] As the Court of Appeal of Arkansas said recently, whether there are "significant Arkansas connections to [a] case . . . is a consideration in more modern conflicts-of-law analysis." *Norton v. Luttrell*, 99 Ark. App. 109, 112, 257 S.W.3d 580, 582 (2007).

arisen out of or relate to Hyperion's activities in Arkansas," and therefore affirmed that no specific jurisdiction existed over that dispute. *Steinbuch II*, 518 F.3d at 587.

Finally, other aspects of this suit also relate to the issue of the "maintenance of interstate order." For example, for purposes of attempting to block discovery in the D.C. case about his professional activities and interactions with students in Arkansas, Steinbuch filed a motion there stating that he "has never claimed that his reputation was hurt at his current employment." Ex. 12 at 2. Yet for purposes of attempting to pursue this case here, he now alleges (in wholly conclusory fashion) that "The book's defamatory comments caused plaintiff professional harm by harming his reputation in the eyes of students" and "professional colleagues." Proposed Am. Compl. at ¶¶ 128-29. This exemplifies the concern about splitting lawsuits and claims in different forums that underlies the second Leflar factor.

*Ganey* also found that, with respect to the third factor – simplification of the judicial task – the "application of [the foreign jurisdiction's] one-year statute of limitations, is outcome determinative and, therefore, favors application of [that jurisdiction's] law." 366 Ark. at 252, 234 S.W.3d at 847. That conclusion applies squarely to this case as well. *See also Schubert*, 360 Ark. at 411, 201 S.W.3d at 922 ("[W]here the out-of-state law is outcome-determinative and easy to apply, there is no good reason not to consider importing it as the law governing the case.").

The fourth factor – "advancement of the forum's governmental interests," 366 Ark. at 252, 234 S.W.3d at 847 – also favors D.C. over Arkansas. As both this Court and the Eighth Circuit found, Arkansas has little interest in a dispute that arose in all material respects prior to Steinbuch moving here.

Finally, as was the case in *Ganey*, the fifth factor – the application of the better rule of law – "does not militate in favor of either state's law [since] Arkansas and [the District of Columbia] have similar" defamation and privacy laws. 366 Ark. at 252, 234 S.W.3d at 847.

Thus, considering both the *lex loci* test and all of the five Leflar factors, D.C. law is the most appropriate choice.

Indeed, considering all of these relevant factors, this case is reminiscent of the choice presented in *Ramsey v. Fox News Network, L.L.C.*, 351 F. Supp. 2d 1145 (D. Colo. 2005). There, the plaintiffs – the parents of Jon Benet Ramsey – brought suit over a television broadcast that aired after they had moved from Colorado to Georgia. By the time they brought suit, they were residents of Michigan. After considering both the *lex loci* and "most significant relationship" tests, the court concluded that "'[t]his is primarily a Colorado case, with a Georgia connection that is[,] at best, now tenuous.'" The broadcast at issue concerns the murder of a child who died in Colorado while plaintiffs lived in Colorado." *Id*. at 1149 (citation omitted). As a result, the court applied Colorado law, rather than the law of either the state of the plaintiffs' present domicile or their domicile at the time of the broadcast. *Id. See also Holmes v. TV-3 Inc.,* 1993 WL 328365 (S.D. Miss., May 27, 1993) (though plaintiff was a Louisiana resident when they brought suit and currently resided in Florida, Mississippi law applied because the locus of events concerning allegedly defamatory broadcast were in Mississippi).

Indeed, numerous courts applying multi-factor choice of law tests in defamation and privacy cases have concluded that where the plaintiff's domicile either at the time suit is filed or even at the time of publication bears much less relationship to the allegedly tortious activity than some other state, the law of that state should apply. *See, e.g. Nationwide, BiWeekly Admin., Inc. v. Belo Corp*, 512 F.3d 127 (5th Cir. 2007) (applying Texas law to defamation suit by Ohio

resident); *Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386 (8th Cir. 1997) (Professor Leflar's factors point to Minnesota law though plaintiff in defamation case was a Texas resident); *Berwick v. New World Network Int'l Ltd.*, 2007 WL 949767, at * 8 (S.D.N.Y., March 28, 2007) ("Because the plaintiffs have failed to allege any meaningful connection between the alleged torts and Pennsylvania aside from their personal residence there . . . . the Court will apply New York law to the remaining three claims as well"); *Karykous v. Sbarro, Inc.*, 2006 WL 2690287, at *5 (D.N.J. Sept. 19, 2006) (concluding that New York law applies to defamation claim brought by New Jersey resident when defendant's executive offices were in New York, the allegedly defamatory statements were made in New York, and the statements "were published in various states").

A similar result should follow here. Once D.C. law is applied, the Proposed Amended Complaint would be clearly time-barred, for the reasons previously discussed. Therefore, this Court should deny Steinbuch's Motion for Leave to Amend.

## CONCLUSION

For the foregoing reasons, Hachette respectfully requests that this Court deny Steinbuch's

Motion for Leave to Amend and grant such other relief as the Court deems proper.

Respectfully submitted,

WILLIAMS & ANDERSON PLC
Twenty-Second Floor
111 Center Street
Little Rock, AR 72201
(501) 372-0800

By: /s/ Clayborne S. Stone
    Philip S. Anderson, Ark. Bar. No. 60001
    Clayborne S. Stone, Ark. Bar. No. 2003102


LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1050 Seventeenth Street, N.W., Suite 800
Washington, DC 20036
(202) 508-1100

Nathan Siegel, *pro hac vice app. pending*
John B. O'Keefe, *pro hac vice app. pending*

*Counsel for Defendant Hachette Book Group*


## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of June, 2009, a copy of the foregoing memorandum

was filed via this Court's CM/ECF system and a copy has been served via U.S. Mail and

electronic mail upon:

Robert Steinbuch, Esq.
6834 Cantrell Road, #222
Little Rock, AR 72207
robertsteinbuch@gmail.com


/s/ Clayborne S. Stone